James Michael ROY, Appellant,

v.

The STATE of Texas, State.

No. 2–94–072–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 30, 1994.

317

Howard E. Watt, P.C. and Bill Loveless, Denton, for appellant.

Bruce Isaacks, Criminal Dist. Atty., Kathleen A. Walsh, Heidi Akins, Sharone McGahee, Asst. Dist. Attys., Denton, for appellee.

Before HILL, C.J., and FARRIS and HICKS, JJ.

OPINION

HICKS, Justice.

In four points of error, appellant James Roy appeals his capital murder conviction. He received an automatic life sentence. *See* TEX.CODE CRIM.PROC.ANN. art. 37.071, § 1 (Vernon Supp.1994). We affirm the conviction.

Appellant was indicted for the capital murder of his father, Windell Roy. The indictment reads, in relevant part:

THE GRAND JURORS, in and for the County of Denton, State of Texas, ... upon their oaths, present in and to said Court that JAMES MICHAEL ROY, who is hereinafter styled defendant, on or about the 29th day of August, A.D., 1993, ... did then and there intentionally and knowingly cause the death of an individual, to-wit: Windell Roy, by strangling the said Windell Roy by manual compression and by strangling the said Windell Roy by ligature with an object or objects unknown to the Grand Jury, and by smothering the said Windell Roy with a pillow on the face of the said Windell Roy, and by a combination of both strangling and smothering the said Windell Roy in the manners alleged herein, for the promise of remuneration from Sylvia Roy; ...

The jury was charged on the offense of capital murder and the lesser included offense of murder. The jury found appellant guilty of capital murder.

On August 30, 1993, at approximately 7:30 a.m., Charles Eck, a City of Carrollton truck driver, was driving east on Midway Road in Denton County, Texas. Eck saw a body on the side of the road and stopped, got out of his truck, and stepped into the ravine to get a closer look. The body "was all purplish" and "wasn't moving," so he called his dispatcher and asked the dispatcher to notify the Lewisville Police Department.

On that same morning, Lewisville police officer Ben Rounsaville was dispatched to a mobile home in Lewisville to take a missing person report from Sylvia Roy. She gave information and a description about her missing husband, Windell Roy. After Officer Rounsaville left the Roy residence, he was dispatched to a scene in Lewisville where the body of a man whose hands were bound with a telephone cord had been found.

Officer Rounsaville secured the scene and waited for other officers to arrive. At least five other officers arrived, including Investigators Karen Phillips and Eddie Barrett. The scene was examined and evidence was collected.

Investigator Barrett, suspecting that the dead man was Windell Roy, brought instant photographs of the dead man to the mobile home of Sylvia Roy. He told her that a deceased person fitting the description of her missing husband had been found. Sylvia Roy appeared neither surprised nor upset, and she did not cry on hearing the news or seeing the photographs of the dead man. She said she could not tell if the dead man was her husband, although she did acknowledge that the body in the photographs was wearing the same clothes as her husband. She then started explaining where she was the night before, which raised Investigator Barrett's suspicion and caused him to think there was a serious problem with the situation and that Sylvia Roy was involved in Windell's murder. Stacy Roy, one of the Roys' daughters, then came home, and she identified the body in the photographs as her father.

Tarrant County Deputy Medical Examiner Gary Sisler performed the autopsy on Windell Roy. According to Dr. Sisler, external injuries included multiple bruises below the left eye and on the left eyelid, and abrasions of the left lateral and left anterior neck. Windell Roy's hands were bound in front of him with a telephone cord. Internal injuries included hemorrhaging of the neck muscles, the muscles that overlie the left spinal cord, the thyroid gland, the muscles attached to the larynx, and the soft tissue of the larynx. Dr. Sisler also found evidence of blunt force trauma to the mouth and to the left front and back of the head, injuries consistent with being knocked unconscious. Dr. Sisler believed that the cause of death was strangulation, caused either by ligature or manual compression. He found no evidence of smothering and opined that if smothering occurred, it would have been after strangulation. Dr. Sisler said that Windell Roy's death could have been caused by a combination of strangulation and smothering.

Stacy Roy testified that she worked at a Lewisville nursing home with her mother, Sylvia Roy. Approximately a year before her father's murder, she was present at the nursing home with her mother when Nancy

Kennedy, an insurance agent, came to the nursing home at her mother's request to discuss the sale of a $250,000 life insurance policy for Windell Roy, naming Sylvia Roy as the sole beneficiary.

Approximately two weeks before her father's murder, Stacy had gone with her mother to Fort Worth to the apartment of appellant, her brother. While in the bathroom there, she overheard part of a brief conversation between her mother and brother. Also, over the summer of 1993, she overheard her mother make several phone calls to her brother.

The last time Stacy saw her father alive was around 6:00 or 6:30 p.m. the evening of his death. He was watching television in the family's mobile home when she left. Around 9:00 or 9:30 that night, Stacy, while walking around the trailer park with friends, saw her brother and another man she did not recognize at the back fence behind their mobile home, and then about thirty minutes later she saw her brother leave in her father's pickup truck. She then waited for a neighbor and friend, Shawn Drummy, to arrive at his mobile home, which was across the street from the Roys' mobile home. When he arrived, they went to the Roys' mobile home and found that Windell Roy was gone, as was his pillow and blanket. They then returned to Shawn's mobile home, with Stacy scared and crying. Stacy eventually went to her home around 1:00 or 2:00 a.m.; her mother had returned home in the meantime.

The next morning the police came to interview her mother about the missing person report, but Stacy did not talk to the police at that time. Later that morning, when Investigator Barrett showed up, Stacy and Sylvia Roy signed "consent to search" forms, and Investigator Barrett searched the Roys' mobile home. In Stacy's room he found a letter from Stacy to Shawn Drummy dated August 30, 1993. Stacy wrote the letter before she went to bed the night before. She had written in the letter that she knew her father was dead. When Investigator Barrett read the letter, he advised Stacy of her rights and asked her about the letter. After Stacy explained the letter to Investigator Barrett and her knowledge about why she had written

the letter, he went to Shawn Drummy's mobile home to talk to him for about fifteen minutes and to take a statement from him. Investigator Barrett then returned to the Roys' mobile home, where another officer was taking a statement from Sylvia Roy.

Later that day, Investigator Barrett went back to the trailer park to look for witnesses to corroborate Sylvia Roy's statement. He talked to Shawn Drummy again, who gave him a note that Sylvia Roy had given Shawn that morning to read to appellant over the phone when appellant called that morning. The three-page note was written by Sylvia Roy to be read by Shawn to appellant over the phone. One page of the note reads:

> James, I am calling for your mother. You can trust me!

The other two pages read:

> James, I will call you but all I will say on my call is Daddy is dead. You slipped up but think you can still cover yourself by saying *He* attacked you first! Someone needs to hit you *hard* in the chest, ect [sic] in order for you to be cover in self defense. Your friend jumped to your defense. Then the body was moved to spare your mother & sisters feelings you felt bad about that but didn't want or know how to tell me.

Investigator Barrett then initiated the proceedings that eventually resulted in arrest warrants for appellant James Roy and Sylvia Roy. Appellant was arrested at his apartment in Fort Worth and was brought back to Lewisville, where he gave a voluntary statement confessing to his participation in the murder of Windell Roy. Appellant's three-page confession reads as follows:

> It started about 3 yrs. ago when my mother (Sylvia Roy) told me that "a white limousine pulled up beside her car and the driver got out, gave her a letter inside an envelope for me." The letter stated that if I would kill my father I would receive about $10,000. I was shocked by that but I thought that it was some kind of sick joke. I then showed the letter to one of my bosses and then threw it away. Since then Sylvia Roy has been after me to do it for her complaining that he (Windell Roy) had been hitting her and making her life a

mess. My mother has been constantly calling me almost every day, trying to get me to do it for her. I agreed to try, but I did not have a way to get down there. She (my mother) told me that she would come get me and take me back. On at least 3 different occasions she did that, but I could not hit my father. I am not capeable [sic] of doing that. She asked me if I know of anybody that could do it for me or help me do it. I told her that I would try to do it, hoping that I could delay this long enough that maybe she would forget the whole thing. But it didn't work. I talked to a friend of mine, Brian Tidrow, and asked him if he knew of anybody that would help "do a job." He said that he would be interested in doing it. He said that he would do it for $400. I then told my mom that [and] she then kept calling me and telling me that she had so many bills that she didn't know what she was going to do [and] if my father died that all of the bills would be taken care of [and] she could move away from the trailer park in which she is living. I couldn't stand to listen to her say all those things about my dad. Me [and] my father never were very close, but I did not hate him and in fact we have talked 3 or 4 times.

Anyway, my mom called again and sounded worried about all of the bills that we[re] due and then offered to give me the truck and a lot of money to kill my father. I told her that I found someone to help me do it, but we would need transportation. Sylvia then told me to offer Brian some more money to find some way down there. I told Sylvia that I would try and see what I could do, trying to delay some more. It didn't work. On Saturday, August 28th, 1993, once again my mother called and said that she would provide transportation for us. We agreed to meet at a parking lot located at 6th and Houston Street in Downtown Fort Worth at 6:30 p.m. on Sunday the 29th. We met there and she took me [and] Brian to the trailer park where my parents live. Sylvia dropped me [and] Brian off about ½ mile away at an Auto Auction place where we told her to pick us up at Albertson's at the corner of Main St. and Garden Ridge. She said that

she would be there at 10:00 p.m. Me and Brian then walked around through the field behind my parent's house until it got dark. When it did, we approached the trailer and knocked on the front door. When my father answered it we both went in, Brian first. As soon as the door shut Brian then started hitting him. Windell fell down on the couch and he was bleeding from his mouth and I think his earholes. I gave Brian a phone cord from the house and Brian tied his hands up. I then put a pillow over his face so I could not see it. We waited until we had cooled down a little bit before leaving. Me [and] Brian then took my dads body,

which I don't know when he actually died, and put it in the back of the truck and we left. We put the body on the side of the road near where we got dropped off at. After that, we went to meet my mother at Albertson's, where we left the truck. When we got in the car she asked if it had been done yet, [and] we told her yes. She told us that we would get our money when the insurance check got there. Sylvia dropped us off at the corner of Vickery [and] St. Louis in Ft. Worth. The next morning, she called me at work to let me know that Windell was missing. Sylvia then called me back later on that afternoon and told me that my father was dead. She also told me that I was seen in the trailer park that night and she told me that I needed to get some bruises on me [and] try to claim self-defense. I then told her no and that if I was questioned, she would verify my story by saying that I went over there to "patch things up with him for all the years that he was not around.["] I told her no again. I am not a violent person and could not have hit or killed my father. I did not even touch my father before moving him to the truck.

Sylvia Roy and Brian Tidrow were arrested after appellant made his confession, and both were also charged with the capital murder of Windell Roy.

◼ Appellant was indicted and convicted under section 19.03 of the Texas Penal Code, which provided in part:

(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

. . . .

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration. . . .

TEX.PENAL CODE ANN. § 19.03(a)(3) (Vernon 1989). The conduct proscribed by section 19.03(a)(3) includes the murder of a person to receive a benefit such as an insurance payment on the life of the victim. *Beets v. State*, 767 S.W.2d 711, 730–31, 737 (Tex.Crim.App. 1988) (op. on reh'g).

At trial appellant did not offer any witnesses on his behalf. As was stated by his attorney in closing argument, appellant's trial strategy was that he was only guilty of murder, not capital murder.

In his first point of error, appellant alleges that the trial court erred in denying his motion for instructed verdict on the ground that the evidence was insufficient to support his capital murder conviction because the State did not produce independent evidence to corroborate his extrajudicial confession.

■■■ In reviewing the sufficiency of the evidence to support a conviction, the evidence is viewed in the light most favorable to the verdict. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim.App.1988). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

■■■ The sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense's evidence outweighs the State's evidence. *See Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim.App.1991); *Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim.App.), *cert. denied*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson*, 819 S.W.2d at 846. The standard for review is the same for direct and circumstantial evidence cases. *Geesa v. State*, 820 S.W.2d 154, 158–62 (Tex.Crim.App.1991).

■■■ Furthermore, the common law corpus delicti rule is that no criminal conviction can be based on a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the corpus delicti. *Fisher v. State*, 851 S.W.2d 298, 302 (Tex.Crim.App.1993). The corpus delicti of any crime simply consists of the fact that the crime in question has been committed by someone. *Id.* at 303. The corpus delicti of murder is established if the evidence shows the death of a person caused by the criminal act of another. *Id.* "The rule does not require that the independent evidence fully prove the corpus delicti, only that it tend to prove the corpus delicti." *Id.* at 302–03. The rule also does not require that the independent evidence corroborate the identity of the perpetrator; that may be established by the extrajudicial confession alone. *Gribble v. State*, 808 S.W.2d 65, 70 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).

Specifically, appellant complains that under *Gribble*, the State was required, but failed, to produce independent evidence corroborating that part of appellant's confession concerning the promise of remuneration, which elevated the crime from murder to capital murder. In *Gribble* the court considered whether a defendant's extrajudicial confession must be corroborated on the elements of the underlying felony offense. *Id.* at 71. The court held that when murder is elevated to capital murder by the allegation of the commission of a felony (such as kidnapping in *Gribble*), evidence independent of the defendant's confession is required to show commis-

sion of the felony.[1] *Id.* That evidence, however, does not have to be sufficient by itself to prove the commission of the felony. *Id.* "So long as there is some evidence which renders the *corpus delicti* more probable than it would be without the evidence, we believe that the essential purposes of the rule have been served." *Id.* at 72.

■ Several capital murder cases following *Gribble* have applied its holding, but they, like *Gribble,* all involved underlying felonies, not the circumstance of remuneration. *E.g., Emery v. State,* 881 S.W.2d 702, 705 (Tex.Crim.App.1994) (burglary), *petition for cert. filed,* (U.S. Sept. 20, 1994) (No. 94–6175); *Chambers v. State,* 866 S.W.2d 9, 15–16 (Tex.Crim.App.1993) (aggravated sexual assault), *cert. denied,* —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994); *Lookingbill v. State,* 855 S.W.2d 66, 73–74 (Tex. App.—Corpus Christi 1993, pet. ref'd) (robbery). No Texas case has applied *Gribble* to a capital murder case to require independent evidence of the promise of remuneration. The State argues that *Gribble* is limited to aggravating felonies that elevate murder to capital murder. If we were to adopt the State's position, we would essentially have to state that the corpus delicti for capital murder is the same as that for murder. In this case, however, the corpus delicti of capital murder is the death of a person caused by the criminal act of another for remuneration. *See Lookingbill,* 855 S.W.2d at 74 ("The corpus delicti of capital murder requires more than homicide by a criminal agency; it includes the elements which raise the offense from murder to capital murder.").

■ Accordingly, we agree with appellant that the State was required to corroborate the corpus delicti, including remuneration, with independent evidence. Nevertheless, we do not agree with appellant that the corroborating evidence was insufficient.

■ Even though appellant does not attack the sufficiency of the evidence corroborating his confession to his participation in his father's murder, that evidence was more than sufficient and includes: (1) Stacy Roy testified that on the night of the murder, she saw appellant and another man behind her family's mobile home; (2) about thirty minutes later, she saw her brother leave in her father's pickup truck; (3) the truck was found at Albertson's, where appellant's confession says the truck was left; (4) she and Shawn Drummy then went to the Roys' mobile home and found that Windell Roy was gone, as was his pillow and blanket; (5) Sylvia Roy wrote the note for Shawn Drummy to read over the phone to appellant to tell him to make the murder look like self-defense; (6) Windell Roy's body was found where appellant said he and Brian Tidrow had dumped it; (7) the body had strangulation and trauma marks consistent with appellant's description of the murder; and (8) Windell Roy's hands were bound with a telephone cord, as appellant described in his confession.

■ The State also produced sufficient independent evidence of the circumstance of remuneration. Appellant stated in his confession that Sylvia Roy offered to give him his father's truck and "a lot of money" to kill his father and that she said he would get the money when the insurance check came. Aside from the other independent evidence already mentioned that corroborates appellant's confession, there was independent evidence tending to show (1) a source (the life insurance policy) for the remuneration; and (2) complicity in the murder between appellant and Sylvia Roy.

Specifically, there was independent evidence that Sylvia Roy took out a $250,000 life insurance policy on Windell Roy about a year before the murder, that she was the sole beneficiary, and that she paid the initial premium. Proof of the existence of the source of the remuneration was extremely important to the State's capital murder case. *See Beets,* 767 S.W.2d at 711. Also, there was independent evidence that appellant did in-

---

1. *But see Holladay v. State,* 709 S.W.2d 194, 200 (Tex.Crim.App.1986) (testimony of accomplice in capital murder prosecution need not be corroborated on elements distinguishing murder from capital murder); *Anderson v. State,* 717 S.W.2d 622, 631 (Tex.Crim.App.1986) (corroboration of accomplice's testimony not required to prove victim's murder was carried out for promise of remuneration).

deed take his father's truck on the night of the murder.

The independent evidence showing complicity between appellant and Sylvia Roy was compelling. Stacy Roy testified about her mother making various phone calls to appellant in the months leading up to the murder and that approximately two weeks before her father's murder, she overheard part of a brief conversation between her mother and brother while at her brother's apartment.

Stacy testified that her mother was not home when the murder was committed but showed up afterwards. The day after the murder, Stacy was present when her mother wrote the note for Shawn Drummy to read to appellant. Shawn testified that on the evening after the murder, Sylvia Roy gave him instructions about what to say to appellant when he called, and she also wrote those instructions in the note. He said that appellant then called and he gave appellant a condensed version of the note, and then, in Shawn and Stacy's presence, Sylvia talked to appellant and repeated to him what she had written in the note. Shawn Drummy kept the note and gave it to Investigator Barrett.

Stacy said that her mother told her she had washed her father's pillow, which had been put in a box in a back room by Sylvia, where it was found. Investigator Barrett said that Sylvia Roy became very upset and wanted the police to leave when he was questioning Stacy.

While some of this evidence, if taken alone, is ambiguous in some respects, overall it renders the circumstance of remuneration more probable than it would be without the evidence. *Gribble*, 808 S.W.2d at 73. Therefore, any rational trier of fact could have found that there was some evidence that the circumstance of remuneration was sufficiently corroborated. *Id.* Appellant's first point of error is overruled.

In his second point of error, appellant complains that the trial court erred in admitting into evidence the life insurance policy that Sylvia Roy had taken out on Windell Roy. Nancy Kennedy, an independent life insurance agent, testified to the following without objection: In October 1992, she met with Sylvia and Stacy Roy at the nursing home where they both worked to discuss a life insurance policy on Windell Roy; she provided Sylvia Roy with the paperwork for a $250,000 policy; she received the paperwork back from Sylvia Roy and an initial premium check to start the policy; and the policy on Windell Roy was issued by Investor's Life Insurance Company of Nebraska.

At that point, appellant's attorney stated: "I object, Your Honor, I would like [to] take the witness on voir dire?" The following exchange then occurred:

Q. Mrs. Kennedy, you are an agent for the insurance company; is that correct?

A. Yes.

Q. And the policy is not an issue out of your office?

A. No, it comes from the home office.

Q. You aren't the custodian of any policy issued by the home office, are you? I mean, they are kept, where was it, Nebraska?

A. Nebraska is the home office.

Q. That's where the policies are kept?

A. No, they are issued there, from there and—

Q. Where is the original policy actually kept?

A. Sent to my office if I am the writer or the agent that writes the policy, it is sent to my office. Either I can become custodian of it or it actually is for the person who is insured, it is their policy.

Q. So where was this policy kept?

A. The policy was with me. I contacted Mrs. Roy and we did not make connection, and she knew that I was holding the policy.

Q. Are you—you are not the person who actually underwrites the policy, correct?

A. No. We have an underwriting department.

Q. Where is that?

A. That would be in Nebraska.

Q. You don't have any personal knowledge of what actually goes in the policy, do you?

A. Would you ask that again?

Q. You don't—you aren't the person that puts in the policy, and you don't actually have personal knowledge of what goes in the policy, correct?

A. Well, I take the information on the application, so I do know there are specific questions to ask.

Q. But as far as the policy itself and what's contained in there, you have no person[al] knowledge of that?

A. Yes, I have—I have some knowledge of what's in that.

Q. You don't underwrite the policy?

A. I don't underwrite it. I don't make the decision.

Q. And you don't draft the policy?

A. No.

Q. Insurance company drafts the policy?

A. Yes.

Q. And you don't have anything to do with that particular decision or that particular drafting of the document, do you?

A. That's correct.

[APPELLANT'S ATTORNEY]: I pass the witness. And I am going to make an objection on the grounds that the predicate for admission under the business records documents has not been met, in that—in that she does not have personal knowledge of the matters contained in the document.

THE COURT: Overruled.

The State's direct examination then continued:

Q. Can you take a look at State's Exhibit Number 21 and tell me if that's the policy that was issued and the papers attached thereto, as far as the first premium check and the information included in State's Exhibit Number 21?

A. This is the life insurance policy that was issued on Mr. Roy.

Q. And what's the effective date of that policy, ma'am?

A. The effective date is 10–23–92.

Q. Let me ask you if the information that's included in that policy, is that a normal course of your business to take information from an applicant, submit it, and issue a policy based on what that applicant has filled out?

A. Exactly.

Q. And the things that are recorded, is that done by a person who has person[al] knowledge of what you are recording?

A. Yes.

Q. Is it done at, or about, or near the time the event is occurring? Basically, the person giving you the information?

A. Exactly.

Q. Is that the type of record that your business, insurance policy, is issuing records and keeps in the daily course of business?

A. Yes.

Q. Let me ask you if you have care, custody, and control of the insurance policies that you issue. Basically, as an underwriter or salesperson for that company, do you have care, custody, and control of those policies?

A. Yes.

[PROSECUTOR]: At this time we are going to offer State's Exhibit Number—

THE COURT: Twenty-one.

[APPELLANT'S ATTORNEY]: I would object again under 803(f), that it's hearsay, and not an exception, in that it's not a person with knowledge. And also that it's not a regular practice of that business activity, being an insurance agent, to make memorandum, reports, records, or data compilation which is the insurance policy.

THE COURT: Objections are overruled. Twenty-one is admitted.

Initially, the State asserts that any error in the admission of the policy was waived by appellant's failure to specifically and timely object to Nancy Kennedy's testimony about her meeting with Sylvia Roy and the issuance of the policy.

 An objection must be timely and specific or error is not preserved. TEX. R.CRIM.EVID. 103(a)(1); *Miller v. State,* 741 S.W.2d 382, 391 (Tex.Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988); *Henderson v. State,* 617 S.W.2d 697, 698 (Tex.Crim.App. [Panel Op.] 1981). To be considered timely, an objection must be made as soon as the ground becomes

obvious. *Thompson v. State*, 691 S.W.2d 627, 635 (Tex.Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). A defendant may not complain on appeal about evidence admitted elsewhere without objection. *Rogers v. State*, 853 S.W.2d 29, 35 (Tex.Crim.App.1993); *Gamble v. State*, 717 S.W.2d 14, 16 (Tex.Crim.App. 1986).

█ Because detailed testimony about the policy was given before the jury without a timely and specific objection, any error in the admission of the policy itself was waived and appellant may not complain on appeal. Thus, the trial court did not err in admitting the policy, and appellant's second point of error is overruled.

█ In his third point of error, appellant alleges that the State committed a *Batson* violation for striking venireperson Danette Anderson for racial reasons.[2] After a *Batson* hearing, the trial court found the State used a racially neutral reason for striking Anderson and denied appellant's *Batson* objection.

█ Appellant acknowledges that because the State offered race-neutral reasons for its strike of Anderson and the trial court found no purposeful racial discrimination, we do not review whether he made a prima facie case of purposeful discrimination based on race. *See Sterling v. State*, 830 S.W.2d 114, 118 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992); *Hill v. State*, 827 S.W.2d 860, 865 (Tex.Crim. App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). When race-neutral explanations are offered, the defendant has the burden to persuade the trial court that the challenge is racially motivated in fact. *Lewis v. State*, 815 S.W.2d 560, 563–64 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992). The defendant must prove affirmatively that the State's race-neutral explanations were a sham or pretext. *Webb v. State*, 840 S.W.2d 543, 544 (Tex.App.—Dallas 1992, pet. ref'd). That burden is not met by the defendant merely disagreeing with the State's explanations. *Id.*

█ In reviewing the trial court's findings on a *Batson* objection, an appellate court applies the "clearly erroneous" standard of review. *Tennard v. State*, 802 S.W.2d 678, 680 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). The role of the reviewing court is not to determine whether the prosecutor's explanations are credible, but rather whether the trial court's ruling on the *Batson* objection is supported by the record and therefore not clearly erroneous. *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Crim. App.1990) (op. on reh'g). We review the evidence in the light most favorable to the trial court's ruling. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). The trial court's finding will be disturbed only if the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Hughes v. State*, 850 S.W.2d 260, 267 (Tex.App.—Fort Worth 1993, pet. ref'd).

█ Two African–American venirepersons were struck; appellant struck one, and the State struck the other, Danette Anderson. The prosecutor testified that she struck Anderson because she was single, young, and had no children. Removal of prospective jurors on the basis of young age can be a racially neutral explanation. *Barnes v. State*, 855 S.W.2d 173, 174 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). She said that she also struck three other prospective jurors for the same reason. The prosecutor admitted that she did not ask Anderson any individual questions, stating that she used the criteria on Anderson's juror information card in her determination to strike Anderson.

---

**2.** The equal protection clause forbids a prosecutor from striking prospective jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 83 (1986). A defendant can assert an equal protection claim even if the excluded venireperson is not a member of the same race as the defendant. *Powers v. Ohio*, 499 U.S. 400, 402, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411, 419 (1991); *Mead v. State*, 819 S.W.2d 869, 870 (Tex. Crim.App.1991).

The State asserts that in a case involving the murder of a father by his son, the criteria for striking Anderson were reasonable. Other than disagreeing, appellant failed to rebut the State's position. We hold that the trial court's ruling on appellant's *Batson* objection was not clearly erroneous and overrule appellant's third point of error.

In his fourth and final point of error, appellant complains that the trial court erred in excluding venireperson Weaver, who was questioned in jury selection as follows:

Q. Anybody else have a question? Does anyone, for moral or religious reasons, or just personal reasons, is there anyone out there that thinks that you could not sit on a jury and determine whether a person was guilty or not guilty of a criminal offense? Anyone think that you just couldn't do that, for whatever reason. I need for you to speak up and tell me now, it's like I said—yes, ma'am.

A. I have thought about that the whole time you have been talking, if I could.

Q. Okay. Tell me what your feelings are.

A. I really don't know.

Q. Are you Ms. Weaver?

A. Uh-huh.

Q. Okay.

A. From the religious standpoint I am not sure if I could.

Q. Okay. Let's take it in two parts. The guilt-innocent first. Do you think that would give you a problem, being able to—

A. I think my problem would be judging him myself, to say whether he is guilty.

Q. You think you would just have a problem, period?

A. I think so.

Q. Just reaching a verdict?

A. Uh-huh.

Appellant did not attempt any rehabilitation of Weaver. The State challenged Weaver for cause, arguing that she said "she would not stand in judgment of another person, could not reach a decision on the guilt-innocence stage." The trial court granted the State's challenge. In its brief, appellant alleges without elaboration that the State's challenge was improper and should not have been granted.

■■■■ The State may challenge for cause any venireperson who "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." Tex.Code Crim.Pro. Ann. art. 35.16(b)(3) (Vernon Supp.1994). A venireperson's inability to enter a finding of guilt warrants sustaining a challenge for cause. *See Mize v. State*, 754 S.W.2d 732, 740–41 (Tex.App.—Corpus Christi 1988, pet. ref'd); *Phillips v. State*, 661 S.W.2d 226, 229 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd). A prospective juror who would ultimately be guided by her personal beliefs rather than by the law is unqualified to sit on a jury. *Castillo v. State*, 739 S.W.2d 280, 296 (Tex.Crim.App.1987).

■■■■ Our standard of review of a trial court's decision to sustain a challenge for cause is whether the totality of the testimony supports the trial court's implied finding of fact that the prospective juror is unable to take the requisite oath and to follow the law as given by the trial court. *Kemp v. State*, 846 S.W.2d 289, 295–96 (Tex.Crim.App.1992); *Cantu*, 842 S.W.2d at 682. An appellant complaining of an erroneously excluded juror must demonstrate that either: (1) the trial court applied the wrong legal standard in sustaining the challenge for cause; or (2) the trial court abused its discretion in applying the correct legal standard. *Kemp*, 846 S.W.2d at 296; *Cantu*, 842 S.W.2d at 682; *see Fuller v. State*, 829 S.W.2d 191, 199–201 (Tex.Crim.App.1992). A reviewing court gives great deference to the trial court, who is in the best position to observe the responses of the prospective jurors and their demeanor. *Kemp*, 846 S.W.2d at 295. Reversal is required only for a clear abuse of discretion—"only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu*, 842 S.W.2d at 682.

■■■ Based on Weaver's unambiguous testimony, we find that the trial court applied the law correctly and did not abuse its discretion in sustaining the State's challenge for

cause to venireperson Weaver. Appellant's fourth point of error is overruled.

We affirm the trial court's judgment finding appellant guilty of capital murder and sentencing him to life in prison.