COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | |
| RAFAEL GUILLEN, | | No. 08-08-00241-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 205th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20070D05440) |
| | § | |

**O P I N I O N**

Rafael Guillen was charged by indictment with capital murder and pled not guilty. A jury found Appellant guilty and the trial court assessed punishment at life. For the reasons that follow, we affirm.

**FACTUAL BACKGROUND**

Appellant was originally arrested for a murder that took place in El Paso County, Texas in 2000. It took over four years for him to be extradited. He had been in custody in Mexico since his arrest in November 2002 under a provisional arrest warrant.

On January 25, 2007, Jose Chavarria, chief inspector with the U.S. Marshall Service, met with Appellant at the attorney general's office hangar at the airport in Mexico City. Mexico Interpol contacted Chavarria to let him know that Appellant was ready to be transported. Appellant underwent a medical exam/physical at the prison and with Interpol. Chavarria testified that he and Inspector Jesus Olzan picked up Appellant on the morning of January 25, 2007 and arrived at the airport around 8 a.m. for their scheduled 10:55 a.m. flight. Appellant was in street clothes and was restrained. His demeanor was described as very quiet and cooperative. He appeared normal and did

not look tired.

The travel route via Continental Airlines began in Mexico City, then to Houston, and finally on to El Paso. Chavarria could not recall whether Appellant slept or had anything to eat or drink on the flight from Mexico City to Houston, but remembered that Appellant was offered breakfast and drinks during the flight. Chavarria testified he had some "small talk" with Appellant. When they arrived in Houston, they met with deputies from the Houston office and went through customs during an hour-and-a-half layover. Chavarria could not recall if Appellant had anything to eat during the layover, nor could he remember whether Appellant slept or had anything to eat or drink during the flight from Houston to El Paso. Appellant's demeanor was again described as very quiet. Chavarria, Olzan, and Appellant arrived in El Paso around 4 p.m. Once in El Paso, Appellant was turned over to El Paso Police Officer Andres Sanchez and Deputy U.S. Marshall David Ochoa.

Sanchez described Appellant's demeanor as calm and coherent. He did not appear tired and did not have any visible injuries. Appellant was transported to police headquarters. He was able to walk on his own, and he did not appear sleepy or intoxicated. Appellant was turned over to Detective Tony Ruiz.

Detective Ruiz and Detective Rodriguez conducted the interview with Appellant. Detective Ruiz explained the charges and the procedures for the interview process. Appellant began to talk about the 2000 incident for about an hour-and-a-half to two hours before agreeing to give a formal interview. At that point, Appellant was read his *Miranda* rights. His first statement lasted an hour. Ruiz testified that he did not coerce Appellant or promise him anything. Appellant appeared coherent and did not appear to be tired, sleepy, or intoxicated. After the first statement, Appellant was allowed to use the restroom and was given a soft drink.

The detectives then stepped out of the interview room and discussed their belief that

Appellant was more involved than what he had initially confessed. They decided to re-approach Appellant and talked with him for another hour-and-a-half before Appellant agreed to give a second statement. During the second statement, Appellant's demeanor was coherent and cooperative.

Appellant filed a motion to suppress. At the hearing, he testified that prior to being picked up at the attorney general's office by the marshals he was being held at the Reclusorio prison in Mexico City, where he had been incarcerated for four years. During the 24-hour period before he was picked up he had been drinking and partying. He had not slept and was not aware he was going to be picked up the next day. He had been without sleep for about three days. Appellant said he was not offered any food or drink. The first time he had something to drink was at the police station.

Appellant then testified that his statements were not true and that the officers made him conform his testimony to what they wanted to hear. Between the first and second statements he was told to change his story to put him at the scene of the crime because the "DA would probably take it smoother on me and probably give me less time, stuff like that." Appellant just wanted to sleep and get it over with. On cross examination, he admitted that he did not have trouble walking and that he was sobered up by the marshal's visit. The trial court denied the motion and found that the statements were not obtained in violation of Appellant's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, the Texas Constitution, and Articles 38.21, 38.22 of the Texas Code of Criminal Procedure.

At trial, the evidence showed that Mercedes Caballero was found murdered in her El Paso home. She was stabbed about twenty times with what appeared to be a knife. At the time of the initial investigation, there were no leads. Based on information provided by Mercedes' brother, the investigators were led to Ana Montti-Almaraz. Initially, they were unable to locate her. Based on a Crime Stoppers tip, the investigators located a vehicle belonging to Primavera Baltazar and a cell

phone number possibly belonging to Ana. The officers were eventually told by Primavera's mother that Ana was using a cell phone registered in Primavera's name. After searching the cell phone records of the victim, the authorities were able to confirm that phone number belonged to Ana.

On August 8, 2000, homicide detective Art Perez received information from a DEA agent out of Houston, Texas regarding a homicide where a female victim had been stabbed to death. Perez subsequently interviewed Maria del Pilar Gonzalez who identified Ana, Primavera, and a male individual. Perez also interviewed Gabriella Barrio who corroborated the information given by Maria. Gabriella was also able to identify Appellant as the unknown male individual. Based on the information provided, Perez secured three arrest warrants for capital murder for Ana Montti-Almarez, Primavera Baltazar, and Appellant. Ana Montti-Almarez was located in Mexico. The purported motive for the murder was that the victim was having an affair with Ana's husband. Perez also obtained information that Ana gave specific instructions on how the murder should be carried out so that the victim knew why she was to be killed.

At trial, Inspector Chavarria, Officer Sanchez, and Detective Ruiz testified about the transfer of Appellant from Mexico to El Paso. During the testimony of Detective Ruiz, Appellant's first and second statements were admitted as States Exhibits 65, 66, 67, and 68. At the beginning of the first statement, Appellant was given his *Miranda* rights. He knew Ana through his childhood friend Primavera. Appellant met with Ana at a shopping center in Juarez, Mexico. Ana wanted Appellant to kill someone for her. Specifically, the girl was a police informant and was also seeing her husband. When Primavera warned Appellant not to do the job alone, Appellant contacted his friend, El Moreno. Appellant and El Moreno traveled to Mexicali on a bus and then flew to Juarez. Appellant showed El Moreno the house where the victim lived and then returned to Juarez. Four or five days later, El Moreno told Appellant he had done the job and Appellant paid him. Appellant

explained to Ana how the murder occurred as El Moreno had explained it to him. El Moreno entered the house and sat the victim on the chair in the kitchen and taped her. When El Moreno laid her down, a little girl appeared. El Moreno put the little girl in a bedroom and then returned to the kitchen where he stabbed the victim. In his first statement, Appellant denied ever going into the house or seeing the victim.

At the beginning of his second statement, Appellant was again given his *Miranda* rights. He explained that he went to the house with El Moreno and entered through the garage. Appellant had a gun in his hand and demanded the victim to drop to the floor. When El Moreno began taping up the victim, a little girl came out and Appellant took her into the bedroom. Appellant then went into the garage to stand look out. He saw El Moreno stab the victim two or three times in the chest and then push her to the floor.

Appellant testified at trial that prior to being brought from Houston, he had never been to El Paso. In 2000, Appellant came to Juarez with Primavera to attend a party that Ana hosted at a ranch. It was at there that Ana first mentioned that he should kill the victim. Appellant returned to Juarez sometime in late January and at that time Ana told him that she was going to hire a professional. Appellant left for Tijuana and two years later he was arrested.

Appellant also testified that he had not eaten and had been up a little over fifty hours when he was transferred from Mexico. The first statement he gave to the police was not true. He gave the statement because the detectives told him that they would talk to the DA and could get him off and he could go home. He just made things up; in fact, El Moreno did not really exist. Appellant claimed that prior to giving his second statement, the detectives told him that they did not believe him and that he would have to say that he was at the murder scene.

On rebuttal, Detective Ruiz testified that the he had not given Appellant details of the crime

prior to his statement. Detective Chavarria also denied giving Appellant details of the crime or showing him photos before his statement.

## VOLUNTARINESS OF CONFESSION

In Point of Error One, Appellant challenges the voluntariness of his confession on due-process grounds. He contends that his confession was not voluntary because he was in need of sleep, had a bad headache, and only wanted to end the interrogation.

### *Standard of Review*

In reviewing a trial court's ruling on a motion to suppress, we apply the standard of review enunciated in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). Under the *Guzman* standard, we give almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact-findings are based on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We afford the same amount of deference to the trial court's rulings on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id*. However, we review *de novo* mixed questions of law and fact not falling within this category. *Id*.

### *Analysis*

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion[.]" TEX.CODE CRIM.PROC.ANN. art. 38.21 (Vernon 2005). A statement may be deemed "involuntary" under three different theories: (1) failure to comply with Article 38.22 of the Code of Criminal Procedure (the Texas confession statute); (2) failure to comply with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); or (3) failure to comply with due process or due course of law because the

statement was not freely given (e.g. coercion, improper influences, incompetency). *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex.Crim.App. 1996); *Moore v. State*, 233 S.W.3d 32, 44 (Tex.App.-- Houston [1st Dist.] 2007, no pet.). A confession is involuntary "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App. 1995); *see also Cravin v. State*, 95 S.W.3d 506, 510 n.3 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd) ("The Texas Due Course of Law provision has not been held to provide any greater protection than that afforded by the United States Constitution's Due Process Clause."). A court bases its determination of whether a confession is voluntary on an examination of the totality of the circumstances. *Ramirez v. State*, 116 S.W.3d 55, 58 (Tex.App.--Houston [14th Dist.] 1998, pet. ref'd). Relevant circumstances for determining whether a defendant's will has been overborne include "length of detention, incommunicado or prolonged interrogation, denying a family access to a defendant, refusing a defendant's request to telephone a lawyer or family, and physical brutality. A defendant's characteristics and status, as well as the conduct of the police, are important concerns." *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex.Crim.App. 1985)(citations omitted).

Appellant maintains that his statements were obtained in violation of due process because he did not have enough sleep, had been drinking and using drugs, and had eaten one meal in two days. However, the trial court found that Appellant was not under the influence of alcohol or narcotics while making his statements. He was coherent, understood what was happening, and was not influenced by any factor other than his decision to give the statement. The testimony of Chief Chavarria, Officer Sanchez, Detective Rodriguez, and Detective Ruiz detailing the transfer of Appellant from Mexico to the United States and the circumstances of his confession support the trial court's findings. Because we find no abuse of discretion in the trial court's ruling, we overrule Point

of Error One.

## SUFFICIENCY OF THE EVIDENCE

In Points of Error Two through Seven, Appellant challenges the legal and factual sufficiency of the evidence establishing certain elements of the offense of capital murder. We first address Appellant's challenge that the evidence is insufficient to corroborate Appellant's confession because there is no other evidence establishing the element of remuneration, a necessary element of capital murder.

*Standard of Review*

In assessing the legal sufficiency of the evidence to support a conviction, an appellate court must consider all of the record evidence in the light most favorable to the verdict, and must determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the defendant guilty of all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Klein v. State*, 273 S.W.3d 297, 302 (Tex.Crim.App. 2008). We consider all of the evidence, whether admissible or inadmissible. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). When the record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton*, 235 S.W.3d at 778. The same standard of review is used for both direct evidence and circumstantial evidence cases. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).

In reviewing factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing our review, we are to give due deference to the fact finder's determinations. *See Johnson*, 23 S.W.3d at 8-9; *Clewis*, 922 S.W.2d at 136. There are two ways in which the evidence may be factually insufficient. The first is that the evidence supporting the verdict, though legally sufficient, is nonetheless too weak to support it. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex.Crim.App. 2008); *Goodman v. State*, 66 S.W.3d 283, 285 (Tex.Crim.App. 2001). The second is that, when considering conflicting evidence, the jury's verdict is against the great weight and preponderance of the evidence. Thus, the question we must consider in conducting a factual sufficiency review is whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the fact finder's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *See Johnson*, 23 S.W.3d at 11.

Under the first part of this standard, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Under the second part, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id*. Before finding that the evidence is factually insufficient to support a verdict under the second part of the standard, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*.

*Corpus Delicti Rule*

Evidence tending to show that a crime was committed must corroborate a defendant's extrajudicial confession. *Williams v. State*, 958 S.W.2d 186, 190 (Tex.Crim.App. 1997); *Chambers v. State*, 866 S.W.2d 9, 15 (Tex.Crim.App. 1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed. 491 (1994); *Fisher v. State*, 851 S.W.2d 298, 302-03 (Tex.Crim.App. 1993). There must be evidence independent of the confession of the fact that someone has committed the crime in question. *Williams*, 958 S.W.2d at 190; *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim.App. 1997). To establish the corpus delicti of murder, the evidence must show the death of a human being caused by another's criminal act. *See Fisher*, 851 S.W.2d at 303. The corroborating evidence need not be sufficient to fully prove the underlying offense; rather, the corroborating evidence need only render the commission of an offense more probable than it would be without the evidence. *Williams*, 958 S.W.2d at 190; *Chambers*, 866 S.W.2d at 15-16. Once corpus delicti requirements are met, a confession to the crime is by itself sufficient evidence to support a conviction. *Lane v. State*, 933 S.W.2d 504, 507 (Tex.Crim.App. 1996).

In *Roy v. State*, the appellate court held that the State was required to corroborate the corpus delicti, including remuneration, with independent evidence. 891 S.W.2d 315, 322 (Tex.App.--Fort Worth, 1994, no pet.). Roy argued that the State was required to produce independent evidence corroborating the part of his confession concerning the promise of renumeration. *Id.* at 321; *citing Gribble v. State*, 808 S.W.2d 65, 70 (Tex.Crim.App. 1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991)(court held that evidence independent of appellant's confession was required to show that his victim had been kidnapped). The court recognized that several capital murder cases following *Gribble* had applied its holding, but all the cases involved underlying felonies, not the circumstances of remuneration. *Id.* at 322; *see e.g., Emery v. State*, 881 S.W.2d 702, 705 (Tex.Crim.App. 1994)(burglary), *petition for cert. filed*, (U.S. Sept. 20, 1994)(No.

94-6175); *Chambers v. State*, 866 S.W.2d 9, 15-16 (Tex.Crim.App. 1993)(aggravated sexual assault), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994); *Lookingbill v. State*, 855 S.W.2d 66, 73-74 (Tex.App.--Corpus Christi 1993, pet. ref'd)(robbery). No Texas case had applied *Gribble* to require independent evidence of the promise of remuneration in capital murder. *Id*. at 322. In *Roy*, the State attempted to argue that *Gribble* was limited to aggravating felonies that elevated murder to capital murder. *Id*. The court disagreed, noting that if the State's position were adopted, it would essentially be holding that the corpus delicti for capital murder is the same as that for murder. *Id*. Although it required the State to corroborate the corpus delicti--including remuneration--with independent evidence, the court found that the evidence was sufficient. *Id*. In his confession, Roy stated that his mother offered to give him his father's truck and "a lot of money" if he would kill his father. He was to receive the money when the insurance check arrived. *Id*. at 322. There was also independent evidence showing (1) a source (life insurance policy) for the remuneration; and (2) complicity in the murder between the defendant and his mother. *Id*. Specifically, there was evidence that the mother had taken out a $250,000 life insurance policy on her husband a year before the murder. She was the sole beneficiary. *Id*. Roy took his father's truck the night of the murder. His sister testified that their mother called him in the months leading up to the murder, and she overheard a conversation between her mother and brother about two weeks before the murder. *Id*. at 323. The mother instructed another individual about what to say when Roy called and the mother wrote down those instructions on a note and repeated them to Roy. *Id*. The mother also became very upset and wanted the police to leave when they were questioning her daughter. *Id*. While this evidence taken alone might be ambiguous, overall it rendered the circumstances of remuneration more probable then it would be without the evidence. *Id*. Therefore, any rational trier of fact could have found that there was some evidence that the circumstance of

remuneration was sufficiently corroborated. *Id*.

Other courts have also applied the corpus delicti rule to the element of remuneration. In *Garza v. State*, the appellant argued that absent the accomplice testimony, there was no evidence corroborating his confession and establishing the corpus delicti of the offense. 915 S.W.2d 204, 210 (Tex.App.--Corpus Christi 1996, pet. ref'd); *see also Tidrow v. State*, 916 S.W.2d 623, 630 (Tex.App.--Fort Worth, 1996, no pet.)(court found testimony of accomplice and victim's life insurance policy to be sufficient independent evidence of a promise of remuneration). The *Garza* court found that there is no requirement that accomplice testimony be disregarded in determining whether an extrajudicial confession is adequately corroborated. *Id*. at 210. It also found the evidence sufficient to establish the corpus delicti of capital murder for remuneration. *Id*. at 210. The court relied on the testimony from the accomplice showing that the appellant expected to receive payment through the accomplice for the killing and that payment was received immediately after the killing. *Id*. at 210.

In *Scott v. State*, the court required the State to corroborate the corpus delicti, including remuneration, with independent evidence. 1999 WL 314805, at *2 (Tex.App.--Houston (14th Dist.), 1999, no pet.). There, an officer testified regarding the information he gathered through his investigation, including an accomplice's statement that the appellant paid him money before and after the murder. *Id*. at *2. The victim intended to testify against the appellant in an upcoming trial. *Id*. The appellant also drove the accomplice to and from the murder scene. *Id*. This evidence was sufficient to corroborate the element of remuneration. *Id*.

And in *Smith v. State*, an accomplice testified that on the day of the murder, the appellant told him that he would receive money once an insurance check was issued. 1999 WL 672519, at *4 (Tex.App.--Houston (14th Dist.) 1999, pet. ref'd). Without reaching the issue of whether the

appellant's statements to the accomplice constituted an extra-judicial confession or otherwise required corroboration, the court concluded that the record contained probative corroboration. *Id*.

The State urges us to consider the testimony of Detective Perez as sufficient corroboration. At trial, Perez testified that the victim was having an affair with Ana's husband and that the killer was given specific instructions so that the victim knew why she was being killed. The information he received and the extent of the victim's injuries led him to believe that the murder was a crime of passion. The detective also testified that Ana was responsible for the murder and paid for it. In rebuttal, Appellant argues that there is no evidence of remuneration other than this statement and that the testimony is speculative hearsay. We disagree. Hearsay admitted without objection has probative value. *Chambers v. State*, 711 S.W.2d 240, 247 (Tex.Crim.App. 1986). The testimony of Detective Perez has probative value and renders the commission of capital murder for remuneration more probable than it would be without the evidence. *See Williams*, 958 S.W.2d at 190; *Chambers*, 866 S.W.2d at 15-16. We overrule Points of Error Two and Three.

*Identity and Remuneration*

In Points of Error Four through Seven, Appellant contends that without his illegally obtained confession, the evidence is legally and factually insufficient to prove the elements of identity and remuneration. A person commits capital murder if "the person commits [a] murder (intentionally or knowingly causing the death of an individual) for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration." TEX.PEN.CODE ANN. §§ 19.03(a)(3); 19.03(b)(Vernon 2003). In his confession, Appellant stated: (1) he agreed to kill the victim for $20,000; (2) he employed El Moreno to do the actual killing; (3) he went with El Moreno to the victim's home; (4) he stood watch while El Moreno stabbed her twenty times; and (5) he gave $10,000 to El Moreno and kept $10,000 for himself.

Sufficiency and admissibility of evidence are distinct issues:

'Sufficiency' relates to whether the elements of an offense have been logically established by all the evidence presented, both admissible and inadmissible. 'Admissibility' relates to the fairness of introducing evidence and its logical relevance. Accordingly, legal and factual sufficiency issues must relate to the elements of offense. The issue of whether or not evidence was illegally obtained is not an element of the offense.

We recognize the decision to exclude evidence may hinge to some degree upon a factual finding. But to the extent that the trial court's decision rests upon a finding of fact, the ultimate issue is still the admissibility of evidence.

*Hanks v. State*, 137 S.W.3d 668, 671 (Tex.Crim.App. 2004), *citing Caddell v. State*, 123 S.W.3d 722 (Tex.App.--Houston [14th Dist.] 2003). Factual sufficiency review is appropriate only with regard to the sufficiency of the State's proof as to the elements of the offense. *Hanks*, 137 S.W.3d at 672. It is not appropriate as to the admissibility of evidence when such a question is submitted to the jury pursuant to Article 38.23(a). *Id.*; *see also Jordan v. State*, 2005 WL 221405 at *1, 5 (Tex.App.--Eastland 2005, pet. ref'd)(not designated for publication)(an issue under Article 38.22, section 6 of the Texas Code of Criminal Procedure is also an "admissibility of evidence" issue, therefore appellant was precluded from challenging the factual sufficiency of the evidence relating to the jury's determination of the voluntariness question).

When an appellant challenges the legal sufficiency of the evidence by asking a court to view less than all of the evidence, an appellant presents nothing for review. *Morales v. State*, 95 S.W.3d 561, 563 (Tex.App.--Houston [1st Dist.], 2002, pet. ref'd), *citing Fuller v. State*, 827 S.W.2d 919, 930-31 (Tex.Crim.App. 1992). The same holds true with regard to a factual sufficiency review. *Id*. We overrule Points of Error Four through Seven.

## JURY INSTRUCTION

In Point of Error Eight, Appellant argues that the trial court failed to properly instruct the jury

regarding the conduct elements applicable to the indicted offense. In its charge, the trial court

defined "intentionally" and "knowingly" as follows:

> A person acts **intentionally**, or with **intent**, with respect to the nature of his conduct
> or to a result of his conduct when it is his conscious objective or desire to engage in
> the conduct or cause the result.
>
> A person acts **knowingly**, or with **knowledge**, with respect to the nature of his
> conduct or to circumstances surrounding his conduct when he is aware of the nature
> of his conduct or that the circumstances exist. A person acts **knowingly**, or with
> **knowledge**, with respect to a result of his conduct when he is aware that his conduct
> is reasonably certain to cause the result.

The definitions mirror those found in Sections 6.03(a) and 6.03(b) of the Texas Penal Code.

TEX.PEN.CODE ANN. §§ 6.03(a); 6.03(b)(Vernon 2003). Appellant did not object to the charge. On

appeal, he complains that these definitions authorize conviction on the "nature of conduct" instead

of the "result of conduct."

In *Cook v. State*, the Court of Criminal Appeals held that it was error for a trial court not to

limit the abstract definitions of "intentionally" and "knowingly" in an intentional-murder case, which

is a result-of-conduct offense. 884 S.W.2d 485, 491 (Tex.Crim.App. 1994). *Hughes v. State*,

handed down the same day, held that it would be error in a capital murder case involving only two

of the conduct elements if the definitions included all three of the conduct elements. 897 S.W.2d

285, 295-96 (Tex.Crim.App. 1994). In *Hughes*, the definitional portion of the charge included the

full statutory definitions of intentionally and knowingly, including result, nature, and circumstances

of conduct language. *Id*. But because the offense did not contain a nature of conduct element, it was

error not to limit the definitions of culpable mental states to result and circumstances of conduct.

*Id*.

We conclude that the trial court erred by including the "nature of conduct", "result of

conduct", and "circumstances" language in the definitions of "intentionally" and "knowingly." But

since no objection was lodged at trial, we must determine whether the error was so harmful that the defendant was denied "a fair and impartial trial." *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App. 1986); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). In other words, a defendant must have suffered actual "egregious" harm. *Arline*, 721 S.W.2d at 351; *Almanza*, 686 S.W.2d at 171. For both preserved and unpreserved charging error, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Arline*, 721 S.W.2d at 351-52; *Almanza*, 686 S.W.2d at 171. In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes*, 897 S.W.2d at 296; *Cook*, 884 S.W.2d at 492 n.6.

We are guided by *Patrick v. State*, 906 S.W.2d 481 (Tex.Crim.App. 1995). There , the court found that even though the definitions of "intentionally" and "knowingly" set forth the three alternative conduct elements, when viewing those terms in their factual context, it became apparent which conduct element applied to which element of the offense. *Id.* at 493, *citing Hughes*, 897 S.W.2d at 297. The application paragraph stated that the appellant "did intentionally cause the death of [the victim]." *Id*. Finding that the term "intentionally" directly modified the phrase "cause the death," the court held it was obvious that the "result of conduct" and "cause the result" language were the applicable portions of the full Code definitions when referring back to the definitions of culpable mental states. *Id*. Because the facts as applied to the law in the application paragraph pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to proving the conduct element of the

underlying offense.  *Id*.

The harm analysis in *Patrick* is applicable here.  The application paragraphs properly instructed the jury to only apply the "result of conduct" language found in the definitions to the "cause of death" language in the application paragraphs.  Specifically, the application paragraphs instructed the jury to only find Appellant guilty if he intentionally or knowingly caused the death of Mercedes Caballero for remuneration, or if Appellant intentionally or knowingly caused the death of Mercedes Caballero by employing "El Moreno" for remuneration or promise of remuneration to commit the murder.  Finding the error to be harmless, we overrule Point of Error Eight and affirm the decision of the trial court.

July 28, 2010

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)