Tim RICE, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–94–00184–CR.

Court of Appeals of Texas,
Taxarkana.

Submitted Feb. 7, 1995.

Decided Feb. 17, 1995.

Rehearing Overruled March 16, 1995.

John M. Cornelius, Marshall, for appellant.

James P. Finstrom, Jefferson, for appellee.

Before BLEIL, GRANT, and CHADICK, JJ. and T.C. CHADICK, Justice, Texas Supreme Court, Retired Sitting by Assignment.

## OPINION

GRANT, Justice.

Tim Rice appeals from his conviction for the offense of murder. He contends in multiple points of error that the trial court committed reversible error by denying his motion to suppress statements, by refusing his requested jury charge instructions on the lesser included offense of voluntary manslaughter, and by permitting the jury to assess a fine exceeding that authorized by law.

This case is a companion to the appeals of Louanne Larson and Tim Rule that recently have been decided by this Court. As in those cases, the undisputed evidence shows that two men, Eddie Wardlaw and Cedric Baker, were shot and killed in an execution-style slaying in a club owned by Louanne Larson at Lake of the Pines. The undisput-

ed evidence also shows that Tim Rule, Louanne Larson, and Tim Rice were alone in the club with the two victims when they were killed. There is no evidence that Tim Rule shot either of these individuals.

Tim Rice, who was a State's witness in the Larson and Rule cases, testified that on the afternoon before the murders, while driving around, he had picked up Baker, gone to Cheryl Riggs' home, and met Wardlaw. Late that night, Riggs and Rice then went to the club, where they, Rule, and Larson used drugs. Rice testified that Larson thereafter asked him to bring Wardlaw to the club. Rice took Riggs home, picked up Wardlaw and Baker, and returned to the club.

There is evidence that Larson believed that Wardlaw had stolen about $200 from her till at "Lou's Place" while working as a doorman there. After Rice brought Wardlaw and Baker to the club, he took them into the office. Rice testified that while Rule cleaned the club, Larson shot Wardlaw, handed him (Rice) the gun, and ordered him to shoot Baker. Rice shot Baker.

There is also evidence that Rice and Rule then wrapped the bodies in plastic bags and wire and placed them into large garbage cans which they loaded into Larson's automobile, transported them over a hundred miles, and dumped the bodies beside the road. There is testimony from Pamela Smith that Rule and Rice stopped at her home near the area where the bodies were left, and that Rule showed her the 9mm pistol and asked her for help to clean it. After they returned, Larson and Rule carried the pistol to Larson's aunt in Mount Pleasant and traded it to her for a .25 caliber automatic of much less value— under the pretext that the gun was too heavy.

Tim Rice then took Rule's pickup truck and fled. Shortly thereafter, Rice contacted the police and informed them of the shootings (of which they were previously unaware) and presented them with one version of the events leading up to the deaths. They went and recovered the bodies, and thereafter Rice gave another statement. He was not arrested until some time later.

Armed with arrest warrants for Rule and Larson, the officers went to Larson's apartment and, finding both Rule and Larson there, arrested them. Five minutes later, Larson signed a consent to search her apartment and shortly thereafter signed a consent to search her car and the club.

Larson informed the officers of the whereabouts of her pistol, and they recovered it from Larson's aunt. Forensic analysis of the bullets found in the bodies showed that the deaths were caused by her 9mm pistol. Blood-stained clothing was discovered during the search of her home. The blood was identified as Wardlaw's, and the stain was caused by blood spatter from a bullet wound. Blood stains found in her office matched both Wardlaw and Baker.[1] Blood stains in her car were identified as Wardlaw's.

Rice's theory of defense as set forth in this appeal is that he only shot his friend Cedric Baker under duress. He states that he only killed his friend because if he had not done so, Louanne Larson would have killed him.

In the multiple statements and testimony given by Rice, his story gradually shifted. In his original version of the facts, he stated that Louanne Larson had shot and killed both of the victims and that he was only a terrified bystander. He eventually admitted that he had killed one of the victims, but contended that he only did so because Larson had already killed one of the victims and threatened to kill him unless he killed the second victim.

■ Rice first contends that the trial court erred by denying his motion to suppress the admission of his statements into evidence. His specific complaint is about the admission of two statements which were both taken on November 19, 1992. The first statement was a tape recorded statement made by Rice on that date to Texas Ranger Dunham in Idabel, Oklahoma. It is undisputed that Dunham did not Mirandize Rice before taking the statement. Later that day, Dunham (without Mirandizing Rice) took a written statement.

1. Although the office had been thoroughly cleaned, a criminal investigation team found minuscule droplets of blood on the ceiling and walls.

■ At a hearing on a motion to suppress evidence, the trial judge is the sole and exclusive trier of fact and the judge of the credibility of the witnesses, including the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App. 1990). Thus, the trial court is free to believe or disbelieve the testimony of any witness. This Court does not engage in its own factual review, but determines whether the trial judge's findings are supported by the record. If they are supported, this Court is not at liberty to disturb them. *Etheridge v. State,* No. 71,189, 1994 WL 273325 (Tex.Crim.App. June 22, 1994); *Upton v. State,* 853 S.W.2d 548 (Tex.Crim.App.1993); *Cantu v. State,* 817 S.W.2d 74, 77 (Tex.Crim.App.1991).

Rice complains on appeal that these statements made on November 19 were inadmissible because, although in custody when they were taken, he had not been warned of his constitutional rights, and because the statements were not voluntary.

■ A person who is questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first be warned in accordance with the mandate of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Shiflet v. State,* 732 S.W.2d 622, 623 (Tex.Crim.App.1985). An officer's obligation to administer these warnings attaches, however, only when there has been such restriction on a person's freedom as to render him in custody. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

In determining whether an individual is "in custody," the totality of all the circumstances must be considered and weighed. *LaPoint v. State,* 650 S.W.2d 821 (Tex.Crim.App. 1983). A court examines all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California,* 511 U.S. ——, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994). The police officer's subjective view that an individual being questioned is a suspect (even if undisclosed) does not bear upon the question of whether the individual is in custody for purposes of *Miranda.* *Stansbury,* at —— — ——, 114 S.Ct. at 1529–1530, 129 L.Ed.2d at 299.

■ The question is whether Rice was in custody at the time that he gave these statements. The undisputed evidence shows that Rice voluntarily contacted a police officer and that the officer went to Rice in Oklahoma to obtain a statement. He was never told that he was under arrest, and there is evidence that he was free to leave at any time during the statements or after they were made. The sequence of events shows that Rice made the first statement to the officer, that they went and recovered the two bodies, and that Rice then made a second statement. The officer testified that Rice was not arrested at that time and that he. was not a suspect at that point. The officer testified that, at Rice's request, he took Rice to his sister's residence and left him there. Rice was therefore not in custody for purposes of *Miranda.* See *Mallard v. State,* 708 S.W.2d 27, 30 (Tex.App.–Texarkana 1986, no pet.). In addition, the first statement was taken in Oklahoma, where the Ranger did not have the jurisdictional authority to arrest Rice.

The evidence supports the trial court's finding that the statements were voluntarily given in this respect and that the officer's failure to inform Rice of his constitutional rights prior to taking the statements did not mandate the suppression of the statements from evidence. No error has been shown in this regard.

■ Rice also contends that the trial court erred by admitting these statements because they were made pursuant to an agreement between him and the State that was breached by the State's actions in prosecuting·him for the murders. Before a promise will render a confession inadmissible, it must be shown that the promise induced the confession. In order to induce the confession, the promise must be (1) positive, (2) made or sanctioned by someone in authority, and (3) of such an influential nature that a defendant would speak untruthfully in response thereto. *Muniz v. State,* 851 S.W.2d 238, 254 (Tex.Crim.App.1993); *Fisher v.*

*State,* 379 S.W.2d 900, 902 (Tex.Crim.App. 1964).

At the hearing on suppression, Texas Ranger Dunham testified as follows on this issue:

Q Did you also indicate to him in some way that if he talked—that if he gave the information and (sic) some killings that he would not be prosecuted?

A Very likely. What—.

Q When you say very likely, what do you mean?

A May I elaborate on that question?

Q Yes.

A I remember in our Idabel meeting that Tim was concerned that I was going to lock him up. I believe that may be the term he used. And I told him at that time that he—I assured him that I wasn't going to arrest him or lock him up because he had—if, in fact, all he had done was help dispose of the bodies in fear of his own life, and he did not participate in the killings, that I didn't think he'd be prosecuted.

Q Well, did you say you didn't think he was going to be prosecuted before he started making any statements, or in the middle of it, or—?

A I can't recall. Tim and I have talked for hours and hours and hours. And to say what particular time those remarks were made, I would—that would be a guess.

Q But it's your impression that he felt that he was not going to be prosecuted if he talked?

A I don't know if I can answer that one way or the other. I'm sure he hoped that he wouldn't.

Later in the hearing, Rice was asked:

Q Did he lead you to believe in any way that you would not be prosecuted if you talked?

A Well, the words, if I can remember correctly, were he just said that if you didn't purposely do any—you know, the way I took it is if you didn't purposely do this, and you are willing to come clean with us, I'd done talked to the prosecuting office in Marion County, and I can make it where you're not prosecuted. He said that's what I can do. I mean that's basically what he told me twice, I believe. He told me once later on in my statement.

Q But he told you that before the recorder ever started on your statement.

A Whenever we first started talking. I just told him that I had some things he needed to know—that needed to get out for sure.

There is evidence that the officer suggested to Rice that he would not be prosecuted if his account of the crime proved to be true. Rice's later statement changed the story. The testimony is not sufficiently clear for this Court to be able to determine as a matter of law that any promise was made, even had Rice held to his original story. In such a situation, the trial court could have determined either that no promise had been made or that Rice had violated the terms of any agreement that had been reached. The court did not abuse its discretion by determining that the statements were voluntarily given and admitting them into evidence.

 Rice next contends that the trial court erred by refusing his requested jury instruction on voluntary manslaughter as a lesser included offense. A jury charge on a lesser included offense is required if (1) all elements of the lesser offense are included within the proof necessary to establish the charged offense, and (2) there is evidence in the record that the accused, if guilty, is guilty only of the lesser offense. *Royster v. State,* 622 S.W.2d 442 (Tex.Crim.App. [Panel Op.] 1981); *see* TEX.CODE CRIM.PROC.ANN. art. 37.09 (Vernon 1981).

The initial question is whether there is evidence in the record that Rice is, if guilty, guilty only of the lesser offense. Voluntary manslaughter is defined as follows:

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation *by the individual killed or another acting with the person killed* which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that *would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render them incapable of cool reflection.*

TEX.PENAL CODE ANN. § 19.04 (emphasis added), Amended by Act of May 29, 1993, 73rd Leg., ch. 900, § 1.01, 1993 Tex.Gen.Laws 3586, 3613-614, current version found at TEX.PENAL CODE ANN. § 19.02 (Vernon 1994). The first (and dispositive) issue is the question of sudden passion. The definition requires that sudden passion be directly caused by and arising out of provocation by the individual killed or by another acting with the person killed. There is no evidence that the victim in any way provoked Rice. There is also no evidence that the victim and Larson were working together to provoke Rice. *See Belachheb v. State,* 699 S.W.2d 709, 713 (Tex.App.—Forth Worth 1985, pet. ref'd). The absence of such proof forecloses Rice's ability to raise this defense because the statutory description of sudden passion has not been satisfied.

Rice's argument that the sudden passion consisted of fear engendered by Louanne Larson's threats is not a situation that falls under the definition provided by the Penal Code. Thus, the evidence does not raise the issue of sudden passion, and the trial court did not err by refusing to tender a charge to the jury on this issue.

█ The evidence set out as supportive of sudden passion does satisfy the requisites for charging the jury on the affirmative defense of duress. Section 8.05(a) of the Texas Penal Code provides that "It is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." TEX.PENAL CODE ANN. § 8.05(a) (Vernon 1994). This defense was presented to the jury.

█ Rice next contends that this Court should reform the judgment in order to correct an erroneous fine. The jury was incorrectly informed in the charge that it could assess a fine of up to $20,000 as part of Rice's punishment. The jury assessed Rice's punishment at ninety-nine years' confinement and a $20,000 fine. Section 12.42 of the Penal Code provides that the maximum fine is $10,000. TEX.PENAL CODE ANN. § 12.42, Amended by Act of May 29, 1993, 73rd Leg., ch. 900, § 1.01, 1993 Tex.Gen.Laws 3586, 3603. Texas Rule of Appellate Procedure 80 specifically provides that a court of appeals may modify the judgment of the court below by correcting or reforming it. We have been cited to no authority in which a court has lowered the amount of a fine from that which a jury was improperly informed was the maximum to the correct maximum permitted under the Penal Code for that offense. Nevertheless, it does appear that under the general authority of Rule 80, such a reformation is viable and both the defense and the State have requested this relief.

The judgment is reformed to set the fine at the statutory maximum of $10,000, and as reformed, affirmed.

CORNELIUS, C.J., not participating.