Daniel Orlando GARZA, a/k/a
El Guero, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–94–206–CR.

Court of Appeals of Texas,
Corpus Christi.

Jan. 25, 1996.

Rehearing Overruled Feb. 22, 1996.

Fred Galindo, Brownsville, for appellant.

Luis V. Saenz, Brownsville, John A. Olson, Brownsville, for appellee.

Before DORSEY, YAÑEZ and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

A jury found appellant guilty of capital murder and assessed his punishment at life in prison. By seven points of error, appellant contends that the evidence is insufficient to support the conviction, that his confession was involuntary and should have been suppressed, and that the trial court erred by failing to make and file written findings of fact and conclusions of law regarding the confession's voluntariness. We affirm the trial court's judgment.

By point of error four, appellant complains that there is insufficient evidence to corroborate his confession. By points five and six, he complains that his confession does not establish the corpus delicti of capital murder, and by point seven, he complains that the evidence is insufficient to corroborate the testimony of Maria Martinez, an accomplice witness. As these four points all concern sufficiency matters, we will address them together.

The record shows that appellant and Dora Cisneros were indicted and jointly tried for the capital murder of Joey Fischer, a senior at St. Joseph Academy in Brownsville and the former boyfriend of Cisneros's teenage daughter, Cristina. Fischer was killed on the morning of March 3, 1993, when he was shot in the head and chest while standing in his family's driveway in the Rancho Viejo section of Cameron County. Family members heard gunshots but did not witness the killing. Fischer's brother saw a white car speed away but could not identify the car or its occupant or occupants. The police were immediately summoned and arrived at the crime scene within minutes. Fischer was already dead when the first officers arrived. A business card from a Dallas area bail bond company was found next to Fischer's body.

About a month after the shooting, the investigators' trail led them to appellant, a San Antonio man with ties to the Brownsville

area. Appellant admitted his involvement in the killing and gave a written statement to the police on March 31, 1993. Appellant was not immediately arrested after giving the statement because the police needed his cooperation in their continuing investigation. Thus, after obtaining appellant's statement, the police asked appellant to meet with Maria Martinez, an elderly woman who appellant said participated in the conspiracy to murder Fischer. Appellant cooperated, and three conversations between appellant and Martinez were monitored and tape recorded by investigators. Recordings of these conversations were admitted in evidence. After appellant and Martinez talked these several times, Martinez was arrested. Martinez then agreed with the investigators to meet with Cisneros, the person who, according to appellant, was behind the crime. The meeting between Martinez and Cisneros was monitored and tape recorded by investigators. At trial, the recording of this meeting was admitted as evidence against Cisneros.

At trial, neither appellant nor Cisneros testified. Maria Martinez was the State's key witness.[1] In her testimony, Martinez described herself as the owner of a second-hand clothing store in Brownsville and admitted that she also read Mexican cards, gave advice, and prepared potions for people seeking cures to their problems. Martinez testified that appellant, whom she referred to as "Guero," initially visited her because of some family problems. Although she could not recall when appellant first visited her, it is clear that both appellant and Cisneros were seeking Martinez's help for their respective problems during the fall of 1992. Appellant made several trips to Martinez's store in an effort to find a solution to his family problems. Martinez prepared oils mixed in holy water for appellant to use. These mixtures were supposed to bring appellant good luck in the resolution of his problems.

Martinez testified that Cisneros came to her for a reading of the cards, seeking answers about the relationship between her daughter Cristina and her Anglo boyfriend, whose name she did not disclose. Martinez did not specify when this meeting occurred.

When Martinez told Cisneros that the boy was "very far away" from her daughter, Cisneros appeared very serious and a little bit angry. High school friends of Fischer and Cristina testified that Fischer and Cristina had gone to Fischer's junior prom together but had broken off their relationship sometime during the summer of 1992. Evidence from other sources showed that Cisneros had attempted persistently to find ways to get Fischer to continue dating her daughter.

Martinez testified that during her second meeting with Cisneros, Cisneros asked her to cast a spell on Fischer. Cisneros said that she wanted something bad to happen to Fischer or for Fischer to get killed. When Martinez told Cisneros that she did not know how to cast that type of spell, Cisneros got upset and left her store. Four or five days later, Cisneros called Martinez and asked her to pray that Fischer would go back to her daughter. At a meeting before Halloween 1992, Cisneros told Martinez that she wanted Martinez to get some guys "to do a little job" for her. Cisneros did not elaborate and left the store.

Martinez approached appellant about "the job" on one of his visits. At first, appellant was not helpful because he did not know anyone who could perform "the job." Ultimately, appellant agreed to find some guys to do "the job" because Martinez promised appellant that his assistance would cure his family problems.

On Halloween, Cisneros left an envelope in Martinez's store for Martinez to give to appellant. Without opening the envelope, Martinez gave it to appellant. When appellant opened it in her store, Martinez saw that the envelope contained a photo of a boy and some papers. Appellant told Martinez that he would "take care of the guys" and left. Martinez testified that Cisneros did not know appellant. In referring to Cisneros, she only told appellant that it was a lady who wanted a job done, but she never revealed Cisneros's real name to appellant. Martinez only referred to Cisneros as "La Clienta" ("the customer").

---

1. The jury was instructed that Martinez was an accomplice witness as a matter of law.

Martinez testified that during November 1992, Cisneros repeatedly contacted her to find out what was going on regarding the job. During one conversation, Cisneros warned Martinez to be very careful, to say nothing about the envelope, and to keep her mouth shut. Cisneros told Martinez on another occasion to tell appellant that she wanted the boy really dead. During November, appellant also contacted Martinez, though only periodically. During one such contact, Martinez passed along Cisneros's message "to kill him." Appellant told Martinez to let the lady know that he was taking care of the guys.

Cisneros did not contact Martinez much during the month of December but did several times during January. Cisneros was upset because nothing was happening. During one discussion, Cisneros told Martinez that "the Gringo" had raped her daughter.[2] Cisneros again told Martinez to tell appellant that she wanted the boy "really dead" and requested that the killer take the boy's ring and wallet to prove that he was really dead. According to Martinez, appellant was busy in Dallas during January but told Martinez that he would come, presumably to Brownsville, at some later date.

During February, Cisneros continued to contact Martinez to find out what was happening. Cisneros wanted to know when, according to Martinez, "they would finish him up." Cisneros told Martinez that she was going to pay $3,000. Martinez, meanwhile, continually told Cisneros that she did not know when the job would be done.

On March 3, 1993, around 8:00 a.m., appellant called Martinez and told her the job was done and to tell the lady. Appellant also told Martinez that he would come over to get the money. Martinez, in turn, told appellant that she would let Cisneros know that the job was done. A short while later, Cisneros telephoned Martinez, as she frequently did, and Martinez told her the job was done. About ten minutes later, Cisneros arrived at Martinez's store and gave Martinez an envelope which she kept until appellant arrived later that day. Cisneros again warned Martinez not to say anything. Later that day,

appellant arrived at Martinez's store. Martinez saw appellant open the envelope and count new hundred dollar bills. Appellant said he was going to "go pay the guys," who were "in the hotel."

Martinez did not hear from appellant again until the end of March. When she did, appellant told Martinez that the other guys wanted more money. This discussion occurred after appellant confessed to the police and offered to cooperate in apprehending Cisneros. Later, when Cisneros next called, Martinez told her that appellant wanted more money. On Monday, April 6, Martinez and Cisneros agreed to meet early the next morning. Late on April 6, Martinez was arrested and, like appellant, she agreed to cooperate with investigators. In doing so, she agreed to wear a hidden microphone on her body so that the police could monitor her scheduled meeting with Cisneros. On April 7, Cisneros arrived as promised, picked up Martinez and drove around Brownsville while a police unit monitored their conversation. Cisneros's vehicle was stopped, and Cisneros was arrested after she gave Martinez an envelope containing $500.

The trial court admitted appellant's confession into evidence. It provides, in relevant part,:

On May 18, 1992 my wife and I separated after twenty-two (22) years of marriage. We had three children. I had always suspected that my wife's mother and aunts had worked through a "Curandera" in San Antonio, Texas to put a bad spell (witchcraft) on my wife and I to separate. My mother-in-law (deceased) never did like me.

On one of the trips I made to Matamoros to visit a sister of mine on or about June of 1992 to get away from my personal problems I decided to go see a "Curandera" (spiritual and physical healer) in Brownsville, Texas. The reason being that I needed to know from her (Curandera) why all this bad things were happening in my life. I only know that her last name is "Martinez" and has a second-hand clothes store ... After that visit I kept calling

2. Cristina testified that she never had sexual relations with Joey.

her and visited her about once a month and kept giving her money.

Sometime in December 1992 I visited "La Curandera Martinez" at her store. It was on that visit that she told me about a "woman" she called her "La Clienta", that needed to have a guy beaten up, that if I knew of anyone that would do it. That the "woman" would pay up to thirty-five hundred ($3,500.00) in U.S. currency. She told me to help her with that and in return she would guarantee me that everything would be alright (sic) with my personal problems. At that time I believed that she gave me joy in my troubled life. That the reason this unknown "Clienta" (woman) wanted to have this guy hurt was because he had sexually violated her daughter and was talking about her at school to others students at St. Joseph School.

I then returned to San Antonio, TX. I didn't make contact with anyone about this. I kept calling "La Curandera" from my house, regarding the update on my personal problems. My divorce was final on January 4, 1993 ... It was during the month of January 1993 that I returned to Brownsville to see the "Curandera" again because I had paid her lots of money and nothing had changed in my life, instead I had gotten a divorce....

On about January 9, 1993, I returned to Brownsville, TX and called "La Curandera Martinez" about the divorce. During this conversation she again asked me if I had talked to anyone or gotten anyone to kill the guy. That the woman (La Clienta) of hers was still wanting to terminate the guy. She again guaranteed me that my luck would change if I helped her with this offer. The "Curandera" kept insisting. Agian (sic), I didn't contact anyone about this.

Sometime during the last week of January 1993 I was in Grand Prairie, Texas working with a friend, Rudy Cuellar and my half-brother, Ramiro Moya. It was during this time that I saw a guy known to me as "Israel" and Heriberto Pizania (sic) at the "Fiesta Rocket Palace." I had met Israel (later known to me as Rafael Soto) and Heriberto at Marcelo Olivarez house

in Brownsville in a neighborhood behind "La Quinta" hotel. I had overheard a conversation at Marcelo's house that time that this so-called Israel had shot a guy and thrown his body in the river in Brownsville, TX.

That evening at the "Fiesta Rocket Palace" this so-called "Israel" bought me a beer and we started talking. It was during this conversation that I mentioned to "Israel" that there was a "woman" in Brownsville wanting to hire someone to hurt a guy. "Israel" was interested. We talked about later meeting in Brownsville and giving him a photograph and address on the guy.

Sometime before "Valentin's (sic) Day" (2–14–93) I met with "La Curandera" at her store. This is the time she gave me the photograph of the young anglo guy, that the woman wanted this young man "dead". This is when she "La Curandera" mentioned to me about having this young man killed and anyone else including his mother dead if she got in the way. The photograph was about 5″ x 7″ in size, and in color. The young man in the photo was wearing a black in color tuxedo with bow-tie. The other side of the photograph had "Joey" and a number "75" written on it. On the corners of the photograph it had "Mother's address, Rancho Viejo" and on the other corner it had, "Father's address on Tejon Road. ["]

Then it was sometime during the last week of February 1993 I met with "Israel" at "La Quinta" hotel in Brownsville, TX. I was enroute to San Fernando, Mexico. Israel and Heriberto had just arrived from Dallas, TX. I didn't go inside their room because they had some women with them at the time. I met with "Israel" outside his room and gave him the photograph.

I already had a room reserved under my name in "La Quinta" that day and headed to San Fernando, Mexico. I returned into Brownsville on March 3, 1993 at about 8:00 a.m. I was in room 238, I think. At about 9:00 a.m. "Israel" came knocking at my door. I led him in, (He was by himself) and he stated, "Ya esta, dame la feria". (It is done, give the money). I told him I

didn't have it with me. That I needed to go get it. "Israel" was staying with Heriberto in a room behind "La Quinta". I told "Israel" to wait. I started walking ... to the "La Curandera's store". It took me awhile to walk to her store, because I killed time wondering what had happened. It was around 12:00 p.m. when I got to her store. Her television set was on "Channel 4" News. That's when I saw the news on the murder at Rancho Viejo Country Club. The photograph of the victim (Joey) was shown on the T.V. screen; I immediately recognized the young man as being the same face on the photograph given to me by "La Curandera Martinez" which I then turned over to "Israel" (Rafael Soto). Then "La Curandera Martinez" gave me a white bank envelope with the money which contained the $3,500.00. However, I never counted the money. The envelope was sealed. I would like to state that I didn't recieve (sic) or offered any money to "hire" these men (Rafael and Heriberto) to assassinate the young man named "Joey."

I then walked back to "La Quinta" to my room. Then I went to their room. It was at this time I saw Heriberto and Israel's uncle, last name as Zepeda. I told "Israel" to come over to my room. This man, Mr. Zepeda, is Marcelo Olivarez wife's brother. I had never seen this Zepeda guy, "Israel" told my (sic) he was his uncle. A few minutes later "Israel" came to my room. I then gave him the white envelope and put it in his shirt pocket. By this time my nephew from Matamoros was honking outside, to give me a ride to the airport in Harlingen. My flight to San Antonio was at 2:10 p.m. On the way to the airport we drove by Rancho Viejo and I noticed some police cars and yellow ribbon around a house. . . .

As far as I know "La Curandera Martinez" does not know the hired gunmen (Israel, now known to me as Rafael Soto or Heriberto) and told me once she didn't want to see or know the "hired gunmen." I would also like to state that Deputy Sheriff Abel Perez of the Cameron County Sheriff's Office showed me three photographs. Two of the photographs being the two men (Israel and Heriberto) the ones

hired to kill "Joey" and third photograph being "Joey's" photo.

Other evidence showed that Heriberto Pizaña obtained a room for two at the La Quinta Inn in Brownsville on March 2, 1993 and departed on March 4, 1993. Another room at the motel was registered to appellant, who arrived on March 1, 1993 and left on March 11, 1993. Telephone records indicate phone calls to the same Dallas area number were made from Pizaña's and appellant's rooms on the day of Fischer's murder. Pizaña's room's call to the number was made at 10:16 a.m. Appellant's room's call to the number was made at 10:24 a.m. Appellant's room's records show other calls to this number at other times during his stay. . The Dallas area number, however, was never identified nor was its connection to the murder ever shown. Pizaña listed his vehicle as a white Grand Marquis on the motel's register.

Other evidence shows that in February 1993, appellant and his half-brother, Ramiro Moya, went with Rudy Cuellar to purchase a .38 Super automatic pistol from a Dallas gun shop. Moya later saw the gun at appellant's San Antonio home. The gun with which Fischer was killed was a .38 Super. After Fischer's murder, appellant reported that the gun was stolen during a burglary from his San Antonio home. The murder weapon was never located.

Investigators traced the business card found at the scene of the murder to Rudy Cuellar. Cuellar and Moya were registered at the Brownsville La Quinta Inn during early February 1993. At trial, Moya testified that he previously told one of the detectives that appellant gave Pizaña a picture of Fischer. Various other witnesses also testified, but their testimony is not relevant to appellant's contentions.

▮ By statute, accomplice witness testimony must be corroborated by non-accomplice evidence. TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979). In determining whether the accomplice testimony is sufficiently corroborated, we eliminate the accomplice testimony from consideration and consider only the nonaccomplice evidence; if the

non-accomplice evidence tends to connect the accused with the commission of the offense, the corroboration is sufficient. *Cockrum v. State*, 758 S.W.2d 577, 581 (Tex.Crim.App. 1988); *Reed v. State*, 744 S.W.2d 112, 125 (Tex.Crim.App.1988).

■ The accomplice testimony shows that Cisneros contacted Martinez to seek out someone to kill an unnamed boy and that Martinez turned to appellant to hire the gunmen. Although appellant's confession and Martinez's testimony contain discrepancies regarding specific dates and happenings, appellant's confession plainly connects appellant to the offense and, thus, corroborates the accomplice testimony. We find the accomplice corroboration sufficient.

■ Appellant next asserts that, if the accomplice testimony is extracted, there is no evidence to corroborate his confession. Appellant's contention apparently is premised on the common law rule followed in this State that a criminal conviction cannot be based on a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the corpus delicti of the offense. *See Fisher v. State*, 851 S.W.2d 298, 302 (Tex.Crim.App.1993). There is, however, no requirement that the accomplice testimony must be eliminated in determining whether appellant's extrajudicial confession is adequately corroborated. Under the corpus delicti rule, our task as an appellate court is to consider all the record evidence, other than appellant's confession, in the light most favorable to the jury's verdict to determine whether that evidence tended to establish that the victim was murdered.[3] *Id.* at 303. The rule does not require that the independent evidence fully prove the corpus delicti, only that it tend to prove the corpus delicti. *Id.* at 302–03. The corpus delicti of capital murder with a remuneration element is established if the evidence shows the death of a human being caused by the criminal act of another for remuneration. *Roy v. State*, 891 S.W.2d 315, 322 (Tex. App.—Fort Worth 1994, no pet.).

■ We find that the record evidence, other than appellant's confession, establishes the corpus delicti of capital murder. The non-confession evidence shows that Joey Fischer was shot twice, once in the head and once in the chest. A weapon was not found at the scene, and Fischer's brother saw a car speeding away from the scene immediately after gunfire was heard. Even excluding the accomplice testimony, which is not required by our law, Fischer's death was clearly caused by the criminal act of another. Martinez's testimony shows that the death was caused for remuneration, and it further shows that appellant expected to receive payment through Martinez for the killing and that appellant was paid immediately after the killing.

We have considered appellant's sufficiency contentions and find sufficient evidence to corroborate both the accomplice testimony and appellant's confession. Accordingly, points of error four through seven are overruled.

By points of error one and three, appellant contends that the trial court erred by failing to suppress his confession. By point or error two, appellant contends that the trial court erred by failing to make and file written findings of fact and conclusions of law regarding the voluntariness of the confession. When a question is raised concerning the voluntariness of a statement of an accused, the trial court must conduct a hearing outside the jury's presence and determine whether the statement was voluntary. TEX. CODE CRIM.PROC.ANN. art. 38.22, § 6 (Vernon 1979). If the trial court finds the statement to have been voluntarily made, the trial court must make written findings and file them among the papers of the cause. *Id.* In the present case, appellant filed a motion to suppress alleging, *inter alia*, that the police made certain misrepresentations and promises which caused him to confess. The trial court conducted a pretrial hearing and denied the motion. No written findings of fact or conclusions of law were made or filed.

---

**3.** The primary purpose of the corpus delicti rule is to assure that no person is convicted without some independent evidence showing that the very crime to which he confessed was actually committed by someone. *Gribble v. State*, 808 S.W.2d 65, 71 (Tex.Crim.App.1990).

The making and filing of findings concerning the voluntariness of a confession are mandatory, and if findings are not made, an appeal will be abated for the trial court to perform its mandatory duty. *See Wicker v. State,* 740 S.W.2d 779, 783–784 (Tex.Crim. App.1987); *Dykes v. State,* 649 S.W.2d 633, 636 (Tex.Crim.App.1983); *Bonham v. State,* 644 S.W.2d 5, 8 (Tex.Crim.App.1983). However, no findings of fact or conclusions of law are required when a statement does not stem from custodial interrogation. *Wicker,* 740 S.W.2d at 787; *White v. State,* 874 S.W.2d 229, 236 (Tex.App.—Houston [14th Dist.] 1994), *pet. dism'd,* 890 S.W.2d 69 (Tex.Crim. App.1994); *Inman v. State,* 683 S.W.2d 40, 42 (Tex.App.—Eastland 1984, no pet.). This is because "voluntariness" is only an issue if the confession was obtained when the speaker was in custody. *White,* 874 S.W.2d at 236. If an investigation is not at an accusatorial or custodial stage, a person's Fifth Amendment rights have not yet come into play and the voluntariness of the waiver of those rights is not implicated. *Melton v. State,* 790 S.W.2d 322, 326 (Tex.Crim.App.1990). Thus, whether the appeal must be abated for the making of findings turns on whether appellant was in custody at the time he confessed.[4] Accordingly, we review the facts relevant to the taking of appellant's confession.

Evidence concerning the confession was presented at the pretrial suppression hearing and at trial.[5] At the suppression hearing, Abel Perez, one of the investigators who obtained appellant's confession, testified for the State, while appellant and his brother, Ramiro Moya, testified for the defense. Perez testified that through his investigation, he learned from Moya that appellant might have information concerning Fischer's murder.

Perez then, through Moya, arranged to meet appellant in San Antonio. Thus, on the morning of March 31, 1993, Perez and investigator Ernesto Flores gathered for breakfast with appellant and Moya at a San Antonio motel. Perez testified that prior to this meeting, appellant was not considered a suspect.

Appellant testified that he was not forced to meet with the officers and did not feel threatened or scared and "wanted to help." Over breakfast, the case apparently was not discussed. After breakfast, the four men went to Perez's motel room. According to appellant, Perez asked for his help on the Fischer case. Appellant testified that he told them he would help. Appellant testified that Perez told him that if he helped, they "would not hurt or harm me." Perez testified that as they talked, appellant told him that he "was up to his neck" in the offense. Because Perez believed that appellant was incriminating himself, Perez read appellant his *Miranda*[6] warnings and then asked appellant if he would accompany him and Flores to Brownsville. Appellant testified that he was willing to go to Brownsville but wanted to return to San Antonio the same day because he had a lot of work pending. Perez testified that appellant agreed to go to Brownsville, asked to retrieve some clothes before going, and then left the motel with his brother. Appellant and Moya returned in about twenty minutes. Perez testified that appellant was not under arrest, and that if appellant had wanted to remain in San Antonio, he would have let him. Appellant testified that the officers promised that they would protect him. Perez testified that appellant was concerned about his safety but that no promises were made to obtain appellant's statement.

---

4. The trial court charged the jury that, before it could consider appellant's confession, it had to determine that appellant knowingly, voluntarily, and intelligently waived his rights. It could be argued that the trial court, by giving such a charge, implicitly found that appellant was in custody. *See Melton,* 790 S.W.2d at 327 n. 2 (Clinton, J., dissenting). We do not hold, however, that the trial court's mere giving of such a charge resolves the custody issue because such a holding would be inconsistent with *Melton,* in which the Court of Criminal Appeals found that the defendant was not in custody, although the jury was actually charged on voluntariness.

5. As evidence concerning the taking of the confession was introduced at trial, we are not limited in our consideration of the issues simply to the evidence admitted at the pretrial hearing. *See Webb v. State,* 760 S.W.2d 263, 273 n. 13 (Tex.Crim.App.1988); *Hardesty v. State,* 667 S.W.2d 130, 133 n. 6 (Tex.Crim.App.1984).

6. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After appellant and Moya returned to the motel, appellant, Flores, and Perez began their trip to Brownsville by automobile. Their exact time of departure is disputed but immaterial to the issues involved in the motion to suppress. Flores drove, while Perez and appellant sat in the back seat. Perez testified that appellant was not under arrest and was not handcuffed, that appellant was cooperative and relaxed, and that he took a statement, writing down what appellant said, as they drove. Perez further testified that appellant was read his rights before the interview and was not promised anything to give the statement. Appellant signed this handwritten confession, identified as pretrial exhibit one, "somewhere around Harlingen."

When they arrived in Brownsville, they went to the Sheriff's Department and Perez typed the confession. According to Perez, while he typed appellant's statement, appellant was not under arrest and was not handcuffed. Perez testified that he made some changes on the typed version to reflect what appellant had actually told him. Perez further testified that when he finished typing the statement, he read appellant his rights again, and appellant read the statement and signed it. Perez testified that he used no threats or force to obtain this statement. Perez admitted that appellant said he wanted protection from the hired killers, but Perez denied that he told appellant he would be taken care of and had nothing to worry about. The typed confession was identified as pretrial exhibit two, and it was this confession which was admitted at trial.

Perez testified that after appellant signed the typed confession, appellant was taken to a motel. A deputy sheriff stayed with appellant that night, according to Perez, "mostly for his safety." The next day, the deputy sheriff drove appellant back to San Antonio.

Appellant's version of how Perez took his statement is largely consistent with Perez's version, but varies in some particulars. For example, appellant testified that Perez promised that he would not hurt him, while Perez testified that no promises were made. Appellant testified that Perez never read him his rights, while Perez testified that he did. Appellant testified that, as they rode from San Antonio to Brownsville, Perez took appellant's statement on yellow sheets of paper, while Perez denied this. In addition, appellant testified that after Perez took his first statement, Perez asked appellant to read it, but appellant told him he could not read. Appellant testified that when Perez assured him the statement was accurate as told to him, appellant signed the yellow paper. Contrary to Perez's testimony, appellant testified that pretrial exhibit one was not the statement he signed on the highway, although he admitted that the signature on it was his. Appellant testified that he signed state's exhibit two, the typed confession, the following morning before returning to San Antonio, while Perez testified that appellant signed it on March 31. The actual statement reflects a signature date of March 31. Appellant further testified that investigator Flores told him not to worry, because if the district attorney sentenced him, he would receive the minimum because of his cooperation. Flores, who did not testify at the suppression hearing, testified at trial that he never promised appellant anything. Appellant testified that he spent the night of March 31 at the motel in Brownsville against his will because he had so much work in San Antonio, but that he was allowed to use the telephone to call whoever he wanted from the motel, and that the County paid for his lodging and food.

Appellant further testified with regard to the typed confession that the officers asked him to read the statement before signing it, but he again told them he could not read. They told him it was the same thing he had stated, and he signed it. A deputy sheriff then drove appellant back to San Antonio.

Both parties agree that two days later, Perez asked appellant to return to Brownsville to assist in the continuing investigation of Fischer's murder. Appellant testified that the police made no promises to get him to return, but he had faith that "they would continue to back me as they had promised." After appellant returned to Brownsville, he assisted the police in tape recording his conversations with Martinez. After that, appellant was taken to the International Bridge and permitted to go to Mexico. During this

time, Perez testified that he considered appellant to be a confidential informant. Appellant was not arrested until June 7, more than two months after he gave his initial statement. Appellant testified that if he had known he had a right not to talk, he would not have talked. Appellant admitted that he was not arrested until June 7, 1993, but said "they" promised that if "I were to be arrested and at the time of my sentencing, the sentence would be the minimum." Moya, who was present in the San Antonio motel room on the morning of March 31, but who did not accompany appellant to Brownsville on that day, testified that he never heard the officers give appellant his *Miranda* warnings.

At the suppression hearing, the parties clashed over whether appellant was "in custody" for purposes of the Fifth Amendment when he gave his confession. Appellant's position appears to be that although he was not formally arrested, he was "in custody" for purposes of asserting his privilege against self-incrimination and was induced to waive that privilege through promises that his cooperation would result in leniency. Appellant is correct in asserting that a person need not be under formal arrest in order to be "in custody" for purposes of the Fifth Amendment. *See Melton,* 790 S.W.2d at 326.

▆ To determine whether a person who has not been formally arrested is "in custody" for purposes of the Fifth Amendment, four factors are typically examined: whether probable cause to arrest existed; whether the defendant was the focus of the investigation; the subjective intent of the police officers; and the subjective belief of the defendant.[7] *Id.* at 325; *Cardenas v. State,* 730 S.W.2d 140, 142 (Tex.App.—Corpus Christi 1987, no pet.).

▆ With respect to whether probable cause to arrest existed and whether appellant was the focus of the investigation, the record clearly shows that before talking with appellant, the officers did not have probable cause to arrest appellant and did not consider him to be a suspect. The record further shows

that the police investigation continued after appellant gave his statement.

With respect to whether the officers had the subjective intent to arrest, the record clearly shows that the officers did not intend to arrest appellant. Even if we look to objective criteria, such as whether the officers read appellant his rights (a circumstance which might indicate an intended arrest) or whether the officers handcuffed him, we do not discover an intent to arrest. First, the testimony regarding the giving of *Miranda* warnings was contested. Appellant testified no warnings were given, while Perez testified that warnings were given several times. Since Perez did not formally arrest appellant, if Perez gave appellant his *Miranda* warnings, the giving of such warnings probably reflects Perez's cautiousness rather than Perez's intent to arrest. *See Dancy v. State,* 728 S.W.2d 772, 777 (Tex.Crim.App.1987). If warnings were not given, the lack of warnings accompanied by no formal arrest indicates that appellant was not in custody. Second, it is undisputed that appellant was not handcuffed, and third, it is undisputed that appellant was transported back to San Antonio after making his statement. Later, the police knowingly permitted appellant to leave the country. These facts indicate that appellant was not in custody on March 31.

With regard to appellant's subjective belief about whether he was under arrest on March 31, appellant's own testimony demonstrates that he did not consider himself in custody. Although appellant complained that he did not want to spend the night of March 31 in Brownsville, the record demonstrates that this was because he had so much work pending at home in San Antonio and not because he was arrested. Considering the above factors, we find that appellant was not in custody when he gave his statement. *See Chambers v. State,* 866 S.W.2d 9, 19 (Tex.Crim. App.1993); *Meek v. State,* 790 S.W.2d 618, 620–22 (Tex.Crim.App.1990); *Wicker,* 740 S.W.2d at 784–87; *Dancy,* 728 S.W.2d at 774–79; *Shiflet v. State,* 732 S.W.2d 622, 628 (Tex.Crim.App.1985); *Penry v. State,* 691 S.W.2d 636, 644–45 (Tex.Crim.App.1985);

---

7. The continued use of this subjective standard has been questioned. *See Lee v. State,* 893 S.W.2d 80, 85 n. 2 (Tex.App.—El Paso 1994, no pet.).

**214**

*Turner v. State,* 685 S.W.2d 38, 40–43 (Tex. Crim.App.1985); *Rice v. State,* 893 S.W.2d 734, 737 (Tex.App.—Texarkana 1995, no pet.); *Lee,* 893 S.W.2d 80, 82–85 (Tex.App.—El Paso 1994, no pet.)

Only in instances when a statement stems from custodial interrogation must the State demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination. *Melton,* 790 S.W.2d at 326. As appellant's statement did not stem from custodial interrogation, voluntariness is not an issue, and we need not abate the appeal for the trial court to make written findings. *Id.; White,* 874 S.W.2d at 236. Accordingly, we find that the trial court did not err in failing to make and file findings of fact and conclusions of law. Point two is overruled.

■ In points of error one and three, appellant generally claims that the trial should have suppressed the typed confession because it was obtained in violation of the law. It is appellant's position that the lack of arrest accompanied by promise of leniency induced appellant's confession. The State first contends that appellant did not preserve error because he did not raise his appellate complaint at the suppression hearing. At the pretrial hearing, appellant claimed, perhaps unartfully, that the confession was unlawful because he was "not placed in custody intentionally" even though he was a suspect. While counsel certainly could have presented his argument more clearly at the suppression hearing, we find that his motion to suppress combined with his oral objections at the suppression hearing raised the issue appellant now asserts on appeal.[8] Thus, we find that appellant preserved error, but for the reasons below, overrule his points of error.

■ Even if we accept appellant's premise that his non-custodial confession could be suppressed because of promises of leniency, we find no error. The trial court had conflicting evidence before it regarding such promises. While appellant testified that

promises were made, the officers testified that none were made.

In reviewing the actions of a trial judge at a suppression hearing, we must construe the record in the light most favorable to his ruling. *Sontag v. State,* 841 S.W.2d 889, 893 (Tex.App.—Corpus Christi 1992, no pet.). The court is the sole finder of fact and its findings will not be disturbed on appeal if there is any supporting evidence. *Carrasco v. State,* 712 S.W.2d 120, 122 (Tex.Crim.App. 1986). As there is evidence that no promises were made, we overrule appellant's first and third points of error.

The judgment of the trial court is affirmed.

---

**8.** Appellant's motion to suppress stated that appellant was treated with courtesy and understanding by officers who requested his cooperation, paid for food, lodging and transportation, and told him that they knew everything and that he had nothing to worry about. The motion alleged that these facts demonstrated a violation of the law.