**Opinion issued February 28, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00866-CR

———————————

## TRACY BERNARD BURLESON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1266102**

---

## MEMORANDUM OPINION

A jury found appellant, Tracy Bernard Burleson, guilty of capital murder and, because the State did not seek the death penalty, the trial court assessed

punishment at confinement for life.[1]  On appeal, appellant contends (1) the evidence is legally insufficient, (2) there was insufficient evidence to corroborate the accomplice witness testimony, and (3) the trial court erred in failing to grant a mistrial when a motion in limine was violated.  We affirm.

## BACKGROUND

Twenty-year-old William Fuller murdered his step-mother, Pauletta Burleson.  Fuller's father, appellant, was convicted of capital muder for agreeing to pay Fuller for the murder.  Fuller was 11 years old when he began living with appellant and Pauletta.  Life was difficult for Fuller in appellant's home.  Appellant and Pauletta fought, both verbally and physically, sometimes even using weapons.  Pauletta was abusive to Fuller, who was a sickly child with sickle cell anemia.  Appellant and Pauletta took government funds intended for Fuller, even after Fuller reached adulthood.  Despite appellant's failure to protect Fuller from Pauletta and appellant's own abuse of Fuller, Fuller and appellant often talked and Fuller knew "all of [appellant's] secrets," including his many extramarital affairs.

Appellant would often tell Fuller that he hated Pauletta and wished he could break free from her.  Appellant said, "Man, sometimes I wish she would die," but also lamented that she "don't even get sick."  Beginning in 2008, appellant began

---

[1]  *See* TEX. PENAL CODE ANN. § 12.31(a) (Vernon 2011), § 19 .03(a)(3) (Vernon Supp. 2012).

2

asking Fuller to kill Pauletta, often resorting to tactics such as guilt and physical abuse. Additionally, appellant would promise Fuller a cut of the insurance proceeds appellant would receive as a beneficiary of Pauletta's life insurance policy. Appellant told Fuller he could not just leave Pauletta because "he had been through too much with her" and he "refused to leave without . . . her insurance money." There was also evidence that appellant had been told by the deacons of the church of which he was the pastor that he would be asked to leave his position if the deacons ever had evidence that he engaged in an extramarital affair.

In the summer of 2009, Fuller moved out of his father's and Pauletta's house and moved in with Tyonne Palmer, whom Fuller described as his best friend. Fuller became a part of Tyonne's family and cared for her and her children deeply. Tyonne, a nurse, took care of Fuller when he was sick. In fact, Fuller was hospitalized for almost a month before Pauletta was murdered and Tyonne was with him the entire time.

In the fall of 2009, Fuller introduced Tyonne to appellant at his church. Though appellant was still married to Pauletta and Tyonne was merely separated from her husband, appellant and Tyonne soon began a sexual relationship. Appellant and Tyonne became engaged to be married, took family pictures together, and represented to Tyonne's friends and family that they were going to

get married soon. Fuller testified that he was not upset when his father began dating Tyonne.

After appellant and Tyonne began their relationship, they soon began to work together "as a pair" to convince Fuller to murder Pauletta. Appellant again promised Fuller a portion of Pauletta's insurance money and Tyonne's car if he would commit the murder. Tyonne meanwhile acquired a gun that Fuller could use. On May 18, 2010, Fuller finally agreed to appellant's plan and he and appellant discussed how he should carry out the murder.

On that evening, appellant and Pauletta got into an argument in their front yard. They were yelling and cursing so loudly that the neighbors could hear them several houses away. Appellant, using a walkie-talkie phone, "chirped" Fuller and told him to come over and "do it right then." Fuller took Tyonne's gun and walked over to his father's house. When he got there, appellant and Pauletta were arguing in the front yard. Fuller walked past them into the house. Appellant followed soon after, verified that Fuller had the gun, and indicated to Fuller that he would distract Pauletta so that Fuller could shoot her.

Appellant went back outside, stood in front of his car, which was parked in the driveway, and resumed his argument with Pauletta, who was sitting in a lawn chair facing the street. Fuller walked out of the house, walked up behind Pauletta, aimed the gun down at the back of her head, and shot her once. Fuller then stood

4

there frozen, until appellant shook him and told him to "get out of there so they could call the laws." He also told Fuller to get rid of the gun.

Tyonne then picked up Fuller, drove him to her cousin's house so that he could shower, and helped him dispose of the gun by throwing it over an embankment near a bayou.

After the shooting, appellant called 911 screaming, "Somebody shot my wife! Somebody shot my wife!" When police first saw appellant he had blood on his shirt. He then lay down on the body saying, "get up Pauletta, get up, Pauletta." The responding officer had appellant sit in the patrol car, where the officer bagged his hands and cuffed his wrists so that he could continue investigating. No gunshot residue was on appellant. Appellant professed his innocence, claiming that he had driven to the store, purchased a candy bar and drink, which he had in the car on the way home. When he arrived home, he discovered Pauletta's body lying in the yard.

When police confronted him with evidence that the store was closed during the time he claimed to have been there, appellant changed his story and said that he just drove to the store, but turned around when he saw that it was closed. He told police that felt like he needed an alibi, so he lied about going in the store.

Despite his claim not to have been there at the time, there was evidence indicating that appellant was in fact at the scene of the crime during the murder.

5

Neighbors heard a man and a woman arguing right before the murder, and appellant even admitted arguing with Pauletta that evening. Pauletta's blood was found on the grill of appellant's car and on appellant's keys. And a spent shell casing, which had not been run over, was found right next to the tire of appellant's car, indicating that the car had been sitting there when the shell was ejected.

Two days after the murder, Fuller and Tyonne also began having a sexual relationship. Fuller even got Tyonne's lips tattooed on his neck. However, a week after the murder, appellant moved into Tyonne's house. After appellant and Fuller got into an argument over Tyonne, and after Fuller told appellant that he wanted to turn himself in, appellant kicked Fuller out of the house.

Fuller soon revealed to a family friend, Perette Rhodes, that he had shot Pauletta. He also told Rhodes that appellant had asked him to murder Pauletta and had promised him a portion of Pauletta's insurance money. Rhodes then called police and told them that Fuller would be a gas station, where police went and arrested him.

Though Fuller initially denied or minimalized his own involvement in the shooting, he eventually told police that appellant had asked him to murder Pauletta. Although Fuller testified that he was "not a hired killer," and that he killed Pauletta because he hated her and wanted to end the years of abuse, he also consistently

6

stated that appellant had promised him a portion of Pauletta's insurance money if he committed the murder.

## SUFFICIENCY OF THE EVIDENCE

In his first point of error, appellant contends "the evidence was insufficient to support a conviction for capital murder as to the remuneration element since it was undisputed that Fuller was not employed to commit the murder for money." Essentially, appellant argues that Fuller killed Pauletta because she was abusive to him and that, absent evidence of a more than "an offer to pay" Fuller, the evidence is insufficient to prove capital murder.

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *Ervin v. State*, 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). Our review includes both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Although we consider all evidence presented at trial, we do not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Because the jury is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

A person commits capital murder if he intentionally commits murder by employing another person "to commit the murder for . . . the promise of remuneration." TEX. PENAL CODE ANN. § 19.03(a)(3) (Vernon Supp. 2012). Murder is properly defined as "intentionally or knowingly caus[ing] the death of an individual," or "intend[ing] to cause serious bodily injury and commit[ing] an act clearly dangerous to human life that causes the death of an individual." *Id.* § 19.02(b)(1)–(2) (Vernon 2011). Remuneration occurs when an "actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim." *Beets v. State*, 767 S.W.2d 711, 737 (Tex. Crim. App. 1987); *see also Rice v. State*, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991). Remuneration "does not require the narrow construction requiring payment by a principal to an agent," but is "given a broad definition[,] which . . . includes the idea of a reward given or received because of some act." *Rice*, 805 S.W.2d at 434.

Appellant, relying on *Hobbs v. State*, 548 S.W.2d 884 (Tex. Crim. App. 1977), argues that appellant did not "employ" Fuller to kill Pauletta because, even though there is evidence that he offered Fuller a portion of Pauletta's insurance

8

benefits, Fuller testified that he killed Pauletta to end years of abuse by her. Appellant points out that Fuller testified that he was not "a hired killer."

In *Hobbs*, the court did not evaluate the sufficiency of the evidence necessary to prove the element of remuneration. Instead, the *Hobbs* court was asked to decide whether an indictment alleged the offense of capital murder. *Id.* at 885–86. In doing so, the court held that an indictment was defective because it alleged a mere "promise to pay" remuneration to the gunman to commit murder, without also "reciting that [Hobbs] hired or employed [the gunman] or that [the gunman] accepted the offer of employment or that [the gunman] did any act demonstrating that he relied on [Hobbs's] promise [of remuneration]." *Id.*

Here, Fuller accepted appellant's offer of employment and acted in reliance on appellant's promise, i.e., Fuller committed the murder after being promised money for doing so, as evidenced by the testimony below:

> Fuller: [F]irst [appellant] would just ask me to do it, then he would say, Well, you not my son. Some days he would get mad and fight on me, then he would come back and apologize and cry and was like, Man, I just want to be with y'all. And he would say, Hey, man, you would even get some money. He was like, Ty even say she'll give you her car if you do it. So, he would come at me different ways to try to get me to do it.

Fuller testified that appellant asked him to kill Pauletta many times, beginning in 2008. Fuller explained that "[a]ny time appellant was asking me to kill Paulette," he would offer to "give me some stacks because he had a hundred-thousand-dollar

9

policy on her."[2]   When Fuller "told [Rhodes] the whole scenario" of his involvement with the murder, he said that he committed the crime "because [his] dad asked [him] to" and "[t]hat [appellant] was going to give [Fuller] some money out of the insurance policy."  In a separate conversation with Rhodes that was recorded by police, Fuller stated that appellant promised to give him money to commit the murder.  Fuller repeated this information in his interview with police.  Fuller also testified that, after the murder, he discussed the insurance policy with appellant again after appellant learned that he would only receive $30,000 as beneficiary—not the $100,000 he had expected.  In both his trial testimony, and in his discussions with Rhodes and police before trial, Fuller consistently stated that he was going to receive a portion of the insurance money that appellant anticipated receiving as a beneficiary of Pauletta's insurance police.

In *Johnson v. State*, 208 S.W.3d 478 (Tex. App.—Austin 2006, pet. ref'd), the defendant was convicted as a party to capital murder for remuneration after her lover killed her husband.  *Id.* at 486–92.  On appeal, the defendant argued that the evidence was insufficient to prove that the murder was committed for remuneration.  *Id.* at 486.  The court of appeals stated that "in order to convict [the defendant] as a party to capital murder for remuneration, it was necessary for the

---

[2]     By "stacks" appellant meant cash, though at times the evidence indicated $2,000 and other times indicated $3,000.  The exact amount is irrelevant to this discussion because the jury charge require proof of "money," but did not specify an amount.

10

State to prove at [the defendant's] trial that [her lover], the primary actor, killed [the defendant's husband] for remuneration." *Id.* at 496. The court then examined the evidence to determine whether it was sufficient to show that the lover committed the murder for remuneration. *Id.* In concluding that the evidence was sufficient to prove that defendant's lover killed the victim for remuneration, the court noted that the "[lover] knew that [the deceased husband] was a wealthy man, and the jury could reasonable infer that [the lover] knew that [the defendant] was the primary beneficiary under [the deceased husband's] will." *Id.* The appeals court held that, from such evidence the jury could logically infer that the defendant's lover "anticipated that she would indirectly share the money and assets that would flow to [the defendant] under the terms of [the deceased husband's] will." *Id.*

Similarly, in this case, the jury could reasonably conclude that Fuller believed that he would share in the benefits that appellant would receive as a beneficiary of Pauletta's life insurance. Although Fuller testified that he was not a "hired killer," there is no requirement that the State prove that remuneration was the only motivating factor for the killing. Indeed, the killer in *Johnson* also had a reason other than remuneration for killing the victim, i.e., eliminating a romantic rival. Therefore, although Fuller may have also killed Pauletta because he hated her and wanted to end her abuse, the record, as detailed above, also contains

11

sufficient evidence to show that he also killed her because of appellant's promise of remuneration.

We overrule point of error one.

## CORROBORATION OF ACCOMPLICE TESTIMONY

Article 38.14 of the Code of Criminal Procedure provides that, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14.  In points of error two and three, appellant contends there was insufficient evidence to corroborate Fuller's testimony regarding (1) remuneration and (2) appellant's participation in the murder.

To measure the sufficiency of the corroborating evidence, we eliminate the accomplice evidence from the record and determine whether the remaining inculpatory evidence tends to connect the defendant to the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).  In applying this standard, we view the evidence in the light that most favors the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)). We consider the combined weight of the non-accomplice evidence, even if that evidence is entirely circumstantial. *Saunders v.*

12

*State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). Corroborating evidence that shows only that the offense was committed is not sufficient. TEX. CODE CRIM. PROC. ANN. art. 38.14, 38.141(b) (Vernon 2012); *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). Yet, the corroborating, i.e., non-accomplice, evidence need not be sufficient, by itself, to establish that the accused is guilty beyond a reasonable doubt. *Long v. State*, 245 S.W.3d 563, 568 (Tex. App.— Houston [1st Dist.] 2007, no pet.).

Likewise, the corroborating evidence need not directly link the accused to the offense. *Castillo*, 221 S.W.3d at 691. Circumstances that appear insignificant may constitute sufficient evidence of corroboration. *Malone v. State*, 253 S.W.3d at 253, 257 (Tex. Crim. App. 2008). Though "mere presence" is insufficient corroboration, evidence that the accused was at or near the scene when or about when it was committed may sufficiently tend to connect the accused to the crime, provided the evidence is "coupled with other suspicious circumstances." *Id.*

Because each case must rest on its own facts, corroboration does not require a set quantum of proof. *Id.* The single requirement is that "some" non-accomplice evidence, on which rational jurors could properly rely, *see id.,* tends to connect the accused to the commission of the offense. *Long*, 245 S.W.3d at 568–69 (citing *Castillo,* 221 S.W.3d at 691).

*Remuneration*

Appellant, relying on *Roy v. State*, 891 S.W.2d 315, 322 (Tex. App.—Fort Worth 1994, no pet.), argues that "since remuneration is a main component of 'the offense committed,' as worded in the accomplice witness rule, it stands to reason that corroboration is required on that element." In *Roy*, the court held that when the State relies on the confession of an accused to support a conviction, there must be independent evidence—including evidence corroborating remuneration—that tends to establish the "corpus delicti" of the offense. 561 S.W.2d at 322.

However, the Court of Criminal Appeals has specifically held that "there is no requirement that the non-accomplice testimony corroborate the accused's connection to the specific element which raises the offense from murder to capital murder." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see also Vasquez v. State*, 56 S.W.3d 46, 48 (Tex. Crim. App. 2001); *Holladay v. State*, 709 S.W.2d 194, 199 (Tex. Crim. App. 1986). Indeed, the Court of Criminal Appeals has held such in cases in which the element raising murder to capital murder was remuneration. *See Anderson v. State*, 717 S.W.2d 622, 630–31 (Tex. Crim. App. 1986) (rejecting defendant's argument that State was required to corroborate accomplice witness's testimony regarding remuneration).

In light of the Court of Criminal Appeals' clear holdings on this issue, we decline appellant's invitation to extend the reasoning of *Roy* to require

14

corroboration of an accomplice witness's testimony regarding the remuneration element of capital murder.

*Defendant's Participation in Murder*

Appellant also argues that, absent Fuller's testimony, the evidence merely places him at the scene of the crime. It is true that "mere presence" is insufficient corroboration. *See Malone*, 253 S.W.3d at 257. However, evidence that the accused was at or near the scene when or about when it was committed may sufficiently tend to connect the accused to the crime, provided the evidence is "coupled with other suspicious circumstances." *Id.*

Here, there are "other suspicious circumstances." For example, appellant initially claimed that he was not present when Pauletta was shot because he had driven to a convenience store, gone inside, bought corn chips and a Baby Ruth candy bar, which he then ate in the car. When confronted by the fact that there were no wrappers in the car, appellant claimed that he threw them out of the way home. Finally, however, after police told him that the store was actually closed at the time he claimed to have been there, appellant claimed that he drove to the store, but turned around when he realized that it was closed. He admitted lying to the police because he did not have an alibi during the time of the murder.

Appellant also lied to police about his relationship with Tyonne. He initially described her to police as Fuller's girlfriend. He later admitted that he was having

an affair with Tyonne at the time of the murder, that he wanted to be with Tyonne, and that he had moved in with her shortly after the murder. This was consistent with the testimony of many other witnesses about the nature of appellant's relationship with Tyonne. This evidence also was inconsistent with appellant's initial representation to police that he and Pauletta had a good relationship.

There was also evidence that appellant had been warned that if the deacons of the church ever had proof that he was involved in an extramarital affair, he would lose his position as pastor at the church.

Fuller testified that appellant promised him a portion of the proceeds from Pauletta's life insurance police. There was evidence from appellant himself that after the murder, he contacted their insurance agent to verify the policy, at which time he learned that he was only the beneficiary of $30,000, not $100,000. Fuller testified that appellant relayed this information to him after his discussion with the agent.

There was also physical evidence that appellant was present when Pauletta was murdered, despite his statements to the contrary. Appellant argues that the presence of Pauletta's blood on the car keys in the car, on the grill of the car, and in the house were merely "transferred blood" from holding his wife's body and left on those surfaces after the murder. The jury, however, could have believed as the State argues, that the blood was projected on the front grill during the shooting,

16

and that appellant had gone into his car after coming into contact with Pauletta's blood to start the engine in order to bolster his story that he had just returned from the store.

There was also other physical evidence suggesting that appellant was present during the shooting. Police recovered "a fired projective that was right next to the front tire of appellant's car." Because the projectile had not been run over, police concluded that it was likely that the projectile was ejected while the car was sitting in the driveway rather than appellant stopping his car right next to the projectile without damaging it when he arrived at the scene.

Another witness, Damon Crawford, testified that while he and appellant were examining the burned ruins of their church about a week before Pauletta was killed, appellant said that "now that the church has been burned down, to make his life complete, he got one more thing to get rid of[.]" At that point, Pauletta approached and appellant "got quiet" and stopped talking.

The cumulative testimony about (1) appellant lying to police regarding his whereabouts on the night of the murder, (2) his volatile relationship with Pauletta—including the fact that he had an affair with Tyonne, (3) the evidence that appellant would lose his position in the church if extramarital affairs were exposed, (4) that appellant knew that he was the beneficiary of a life insurance policy on Pauletta and that he checked on the status of that policy shortly after her

death, and (5) physical evidence suggesting, despite his protests to the contrary, that he was physically present during the shooting are all circumstances connecting appellant to the crime, thereby corroborating Fuller's testimony.

We overrule points of error two and three.

## DENIAL OF MISTRIAL

In Point of Error Four, Appellant asserts that the trial court erred by denying his motion for mistrial based on an alleged violation of a motion in limine by the State. The trial court granted Appellant's motion in limine and prohibited the State from eliciting evidence regarding appellant's alleged involvement with the arson of the church for which he was the pastor. Appellant directs our attention to the following exchange:

> [Prosecutor]: So, May 18th of 2010, the date that you killed Pauletta Burleson, tell me what the beginning of that day was like.
>
> [Fuller]: Him and Ty was still together but they was, like—she had told him he had one more week left but he kept saying he needed more time because him and Pauletta had just set their church of fire and he wanted to play that off—
>
> [Defense Counsel]: Judge, may we approach?
>
> [The Court]: Sure.
>
> [Prosecutor]: I'm sorry. I did not mean for that to come out.
>
> [The Court]: She may not have meant for it to come out but it did come out.

18

[Prosecutor]: I can—I can clear it up in that he was never told by Tracy that he set the church on fire, that he heard other people say it, but that just brings more attention to it.

[The Court]: I think you need to just object. I mean, it certainly wasn't in response to the question at all.

[Defense Counsel]: We, I do object, Judge, but the issue is not whether it was intentionally elicited. It's whether or not this witness knows not to blurt out something that's a subject of a motion in limine. So, I'd at least like you maybe outside the presence of the jury to admonish him again that that's something he can't be doing.

[Recess. Jury not present]:

[The Court]: Right back up here. Don't mention the church burning down. You with me? I don't want to try this case again.

[Fuller]: (nods head affirmatively)

[Defense Counsel]: Judge before you bring the jury back, we're on the record and I'm going to, one, object to this witness' violation of the Court's motion in limine regarding the fire at the church or the allegation that there might have been an arson by Mr. Burleson. The Court had granted my motion in limine as to that issue and this witness, right before we took the break, blurted out before the jury that my client had admitted to him that he had burned the church down. It's a violation of my motion in limine.

[Trial Court]: I think he implicated both the complainant and the defendant, actually.

[Defense Counsel]: He may have, Judge. I'm more concerned about my client.

[The Court]: I understand. I wanted to be clear.

[Defense Counsel]: As a result of that, I'm going to move for a mistrial, Judge. I think it improperly injected the issue of the potential

19

arson of this church into this trial which is what the Court's motion in limine was intended to preclude.

[The Court]: And before we broke, you all came to the bench and you did not—I said that you could object because you had not made the objection; so, I did not rule on the objection because one wasn't made.

[Defense Counsel]: Correct.

[Trial Court]: So, at that point I instructed not only the State but now I have instructed the witness not to talk about the fire in any way, shape or form.

I do not believe that the—so your objection would be sustained. I don't believe that the—the defendant (sic) was not answering—he was nonresponsive to the question. And so, the Court is going to deny you motion for mistrial.
.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). An appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Wead*, 129 S.W.3d at 129. A mistrial is required only in extreme circumstances where the prejudice is incurable. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins*, 135 S.W.3d at 77.

A complaint regarding the admission of evidence may take three forms: (1) a timely, specific objection; (2) a request for an instruction to disregard; and (3) a

20

motion for mistrial. *See Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). Each of these methods furthers the policies of preventing and correcting errors and conserving judicial resources. *Id.* An objection serves as a preemptive measure because it prompts the prevention of harmful events. *Id.* An instruction to disregard is a corrective measure because it attempts to cure any harm or prejudice resulting from events that have already occurred. *Id.* In a case where the prejudice is curable, an instruction eliminates the need for a mistrial and serves to conserve judicial resources. *Id.* A mistrial is also a corrective measure but it is reserved for those cases where an objection could not have prevented and an instruction to disregard could not cure the prejudice stemming from an event at trial. *Id.* A party who fails to request an instruction to disregard forfeits appellate review of events that could have been cured by such an instruction. *Id.* at 70. But if an instruction to disregard could have not had that effect, the only suitable remedy is a mistrial, and a motion for a mistrial is the only essential prerequisite to presenting the complaint on appeal. *Id.* When a party's first action is to move for mistrial, as in this case, the scope of appellate review is limited to the question of whether the trial court erred in not taking the most serious action of ending the trial. *Id.* When a defendant moves for mistrial without first requesting an instruction to disregard, as occurred in this case, he will obtain reversal only if the error could not have been cured by an instruction to disregard. *Id.*

Appellant argues that a mistrial was required, and a motion to disregard the error would not have been sufficient, because "Fuller imparted information to the jurors that Mr. Burleson had commented a horrendous act—arson of a place of worship." It is well established that testimony referring to or implying extraneous offenses can be rendered harmless by an instruction to disregard unless they are so clearly calculated to inflame the minds of the jury and are of such a nature as to suggest the impossibility of withdrawing the impression produced. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). Whether a witness's improper reference to an extraneous offense warrants a mistrial depends on the particular facts of the case. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). Because a mistrial is an extreme remedy, a trial court should declare a mistrial only when the error or misconduct is "highly prejudicial and incurable." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *Hudson v. State*, 179 S.W.3d 731, 738 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

We conclude that Fuller's uninvited, unembellished reference to appellant's alleged involvement with arson of the church was not so inflammatory as to undermine the efficacy a motion to disregard, had one been requested. The State did not intentionally elicit the information. And, although this was the first direct evidence referencing the church fire and appellant's alleged participation in it, the jury had already heard evidence regarding the fire. For example, Damon

22

Crawford, a deacon at the church, testified, without objection that when he and appellant were inspecting the burned church, appellant "was telling me that now that the church has been burned down, to make his life complete, he got one more thing to get rid of and that's when Sister Burleson walked in; he got quiet." While this testimony did not directly allege appellant's involvement with any arson at the church, it certainly suggested that appellant had gotten rid of the church, and if he got rid of one more thing, i.e., his wife, his life would be complete. There had also been unobjected-to evidence in the form of appellant's statements to the police regarding insurance coverage on the church, with appellant pointing out that he would not benefit financially from burning of the church. Additionally, while arson of a church may be "a horrendous act," as described in appellant's brief, it is not more heinous or inflammatory than the capital murder offense with which appellant was charged. *See Gregory v. State*, 159 S.W.3d 254, 262 (Tex. App.— Beaumont 2005, pet. ref'd).

Therefore, we conclude that Fuller's statement was not clearly calculated to inflame the minds of the jury, nor was it of such a character that it was impossible to remove the harmful impression. Because the error could have been cured by a motion to disregard had one been requested, the trial court did not err by refusing to take the most dramatic remedial measure possible, i.e., granting appellant's motion for mistrial.

23

We overrule point of error four.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

Do not publish.   Tex. R. App. P. 47.2(b).